# Depositions

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION



```
HITUL GANDHI, individually  )
and on behalf of a class of )
others similarly situated,  )
                            )
          Plaintiff,        )
                            )
vs.                         )   No. A-08-CA-248-JRN
                            )
DELL INC., and DELL         )
MARKETING USA, L.P.,        )
                            )
          Defendant.        )
_____

CATHERINE L. DAVIS and TOMMY)
MOORE, Individually and on  )
Behalf of others similarly  )
situated,                   )
                            )
vs.                         )   No. A-08-CA-794-JRN
                            )
DELL, INC. d/b/a DELL       )
COMPUTER, INC., a Delaware  )
corporation, DELL USA L.P., )
a Texas Limited Partnership )
and DELL MARKETING L.P., a  )
Texas Limited Partnership,  )
                            )
          Defendant.        )
```

MID-CONTINENT TOWER
401 South Boston, Suite 310
Tulsa, Oklahoma 74103
918-599-0507

depo@drreporting.com

ROBINSON RENAISSANCE
119 N. Robinson, Suite 650
Oklahoma City, Oklahoma 73102
405-235-4106

REPORTING & VIDEO, INC.

D&R

Atsumi, Amy Mai 12-17-2008

**Page 2**

1
2
3       DEPOSITION OF AMY MAI ATSUMI
4     TAKEN ON BEHALF OF THE PLAINTIFFS
5       IN OKLAHOMA CITY, OKLAHOMA
6          ON DECEMBER 17, 2008
7
8
9
10
11
12
13   Reported by:  Elizabeth Caudill, CSR, RMR, CRR
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                    CONTENTS
2                  Page  Line
3  Direct Examination by Ms. Waters . . . . 6   6
4  Cross-Examination by Mr. Fox . . . . . . 169  20
5  Redirect Examination by Ms. Waters . . . 171  6
6  Jurat Page . . . . . . . . . . . . . . . 176
7  Witness Signature Page . . . . . . . . . 177
8  Reporter's Certificate. . . . . . . . . 178
9
10

          PLAINTIFF'S INDEX OF EXHIBITS
11
                    Page  Line
12
13  Exhibit 1 . . . . . . . . . . . . . 9    16
14  Exhibit 2 . . . . . . . . . . . . . 10   6
15  Exhibit 3 . . . . . . . . . . . . . 43   4
16  Exhibit 4 . . . . . . . . . . . . . 51   6
17  Exhibit 5 . . . . . . . . . . . . . 75   11
18  Exhibit 6 . . . . . . . . . . . . . 83   14
19  Exhibit 7 . . . . . . . . . . . . . 103  19
20  Exhibit 8 . . . . . . . . . . . . . 124  15
21  Exhibit 9 . . . . . . . . . . . . . 143  2
22
23
24            * * * * * *
25

**Page 3**

1        A P P E A R A N C E S
2  For the Plaintiff:  Allison B. Waters
        Attorney at Law
3        10205 North Pennsylvania
        Oklahoma City, Oklahoma 73120
4
5        Matt Dameron
        Attorney at Law
6        460 Nichols Road
        Suite 200
7        Kansas City, Missouri 64112
8  For the Defendant:  Michael W. Fox
        Attorney at Law
9        301 Congress Avenue
        Suite 1250
10       Austin, Texas 78701
11
12       Christopher Hahn
        2801 Via Fortuna
13       Suite 100
        Austin, Texas 78746
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Atsumi, Amy Mai 12-17-2008

14

1 Exhibit 2, I know you said you're not familiar
2 with this document, per se, but there's a couple
3 references here. One of them is to -- if you'll
4 look at the third page which is marked Davis 45.
5    A  Yes, ma'am.
6    Q  And at 58 it says "ISR, inside sales
7 representative."
8    A  Yes.
9    Q  Do you see that?
10   A  Yes, I do.
11   Q  Is ISR the term that would include
12 business sales representatives?
13   A  Yes, ma'am.
14   Q  Does it encompass more than just
15 business sales representatives? In other words,
16 would it include consumer sales representatives,
17 as well as business sales representatives?
18   A  It would include that.
19   Q  Do you see any other terminology that's
20 listed on this dictionary page that would include
21 a business sales representative other than number
22 58, ISR?
23   A  Could you rephrase -- could you state
24 your question one more time just to make sure
25 I'm --

15

1    Q  Do you see on the dictionary pages I've
2 presented to you as Exhibit 2 any other terms
3 that would incorporate the ISR job function other
4 than number 58?
5    A  So in the document you provided, page
6 labeled Davis 0046, there is item number 77 --
7    Q  Okay.
8    A  -- that says "relationship sales
9 representatives." Those are individuals whom we
10 consider sales representatives also included in
11 our business sales division.
12   Q  How do those differ from ISR's?
13   A  Relationship sales representatives?
14   Q  Yes.
15   A  Their job responsibilities differ in
16 some regard with regards to how they manage their
17 customer relationships.
18   Q  And what is the difference, generally,
19 if you could tell us?
20   A  Relationship sales representatives are
21 assigned accounts to which they maintain and
22 manage, and often outbound contact to those
23 customers directly rather than waiting for those
24 customers to call in through a queue.
25   Q  And these accounts, are these business

16

1 accounts?
2    A  Yes, ma'am.
3    Q  Now, I take it the ISR terminology
4 would include not just sales reps that are
5 focused on selling to businesses but it would
6 include consumers; correct?
7    A  Yes, according to our job titles.
8    Q  But the RSR function would only be
9 business-focused sales?
10   A  No. We have individuals with the job
11 title ISR that are relationship sales
12 representatives.
13   Q  That focus on consumer sales?
14   A  No. The individuals that support
15 relationship customers are included -- are part
16 of our business sales division.
17   Q  Okay. I guess I'm confused.
18   A  Sure.
19   Q  I'm just trying to get to: Are the
20 RSR's focused only on selling to businesses,
21 ma'am?
22   A  Yes.
23   Q  Okay. But the terminology ISR can
24 incorporate more than business-focused sales
25 reps; correct?

17

1    A  Correct.
2    Q  All right. Now, are you saying that
3 the RSR's, would those individuals fall under the
4 category ISR?
5    A  Yes, that is what I'm saying.
6    Q  Okay. Now, in terms of compensation, I
7 understand there's been a change. Consumer sales
8 reps are now hourly employees; is that correct?
9    A  Correct.
10   Q  However, the business sales
11 representatives -- by the way, what's the best
12 way to refer to business sales representatives?
13 Do you use any type of acronym?
14   A  No. You can utilize business sales
15 representatives if my understanding is by your
16 use non-consumer sales representatives.
17   Q  All right. Are those folks, are they
18 hourly or are they salaried individuals right
19 now?
20   A  Currently they are salaried individuals
21 non-exempt.
22   Q  So there's been no change to the
23 business sales representatives as there was with
24 the consumer sales representatives in terms of
25 compensation?

Atsumi, Amy Mai 12-17-2008

18

```
 1    A   With regard to salary status, no.
 2    Q   All right.  Now, going back to your
 3  responsibilities and the call centers that fall
 4  under your responsibility, Oklahoma City employs
 5  business sales representatives; correct?
 6    A   Correct, among other employees as well.
 7    Q   What about Twin Falls, Idaho, do you
 8  have business sales representatives employed at
 9  that call center?
10    A   No, we do not.
11    Q   What are the functions that are
12  represented at that call center?
13    A   Primarily customer care agents, as well
14  as technical support representatives.
15    Q   Are there any RSR's employed at Twin
16  Falls?
17    A   No, ma'am.
18    Q   Now, what about the -- is it Fremont,
19  California?
20    A   Yes.
21    Q   Is that solely tech support or do you
22  have business sales representatives at that call
23  center?
24    A   Solely tech support.
25    Q   All right.
```

19

```
 1    A   We do have a few outside account
 2  executives but they are considered outside sales
 3  account managers.
 4    Q   Dell does not consider those business
 5  sales representatives?
 6    A   They're considered sales
 7  representatives but not inside sales
 8  representatives.
 9    Q   Now, who do you report to?
10    A   Cheryl, C-H-E-R-Y-L, Heitzler,
11  H-E-I-T-Z-L-E-R.
12    Q   What is her title?
13    A   Vice-president/human resources.
14    Q   Is she located in Oklahoma City?
15    A   No, she is not.
16    Q   Is she in Round Rock?
17    A   Yes.  She works out of our Round Rock
18  facility.
19    Q   Now, other than the western -- what did
20  you call the division that you're responsible
21  for?
22    A   Western half of the United States.  We
23  also call it U.S. west.
24    Q   Okay.  What are the other divisions
25  that are comparable to that one within Dell?
```

20

```
 1        Do you understand my question?
 2    A   I don't.  If you could please repeat it
 3  or rephrase it.
 4    Q   Do you have counterparts that are
 5  responsible for other divisions within the U.S.?
 6    A   Yes, I do.
 7    Q   And what are the names of those other
 8  divisions?
 9    A   I have a counterpart who is responsible
10  for what we consider U.S. east, eastern half of
11  the United States.
12    Q   Okay.
13    A   Central Texas.
14    Q   Any others?
15    A   I have a counterpart that is
16  responsible for Canada and a counterpart that is
17  responsible for Latin America.
18    Q   And focusing just on those divisions
19  that are continental U.S. or Alaska and Hawaii,
20  do your counterparts at U.S. east and central
21  Texas divisions also report to Ms. Heitzler?
22    A   Yes.  And it is the same individual for
23  U.S. east and central Texas.
24    Q   What's the name of that individual?
25    A   Kellie, K-E-L-L-I-E, Teal-Guess.
```

21

```
 1    Q   Can you spell that for us?
 2    A   T-E-A-L hyphen G-U-E-S-S.
 3    Q   All right.  And I take it
 4  Ms. Teal-Guess also supports, similarly to you,
 5  other call centers in different locations across
 6  the U.S.?
 7    A   That is correct.
 8    Q   And is she responsible for call centers
 9  in Round Rock and Nashville?
10    A   Yes, ma'am.
11    Q   Was she also responsible for a call
12  center in McGregor?
13    A   No, ma'am.
14    Q   Who was responsible for that call
15  center?
16    A   If I'm correct, the human resources
17  leader at the time that -- McGregor as in Texas;
18  correct?
19    Q   Yes.
20    A   At the time that McGregor existed, I
21  believe that the human resources person
22  responsible was Shawn Maurice.
23    Q   Was Ms. Maurice also responsible for
24  the Oregon call center?  Or the Roseburg call
25  center?
```

Atsumi, Amy Mai 12-17-2008

**22**

1  A  That is my understanding.
2  Q  Okay.  Now, other than Round Rock,
3 Nashville, and now McGregor which is closed --
4 and that's correct, it's closed; correct?
5  A  Correct.
6  Q  All right -- are there any other call
7 centers that you're aware of that employ business
8 sales representatives?
9  A  Could you repeat that question one more
10 time?
11  Q  Sure.  Other than Round Rock,
12 Nashville, and the Oklahoma City call center and
13 the now closed down McGregor call center, are you
14 aware of any other call centers that employ
15 business sales representatives?
16  A  No, I am not.
17  Q  All right.  So we would need to talk to
18 Ms. Teal-Guess if we were wanting to get
19 information about business sales representatives
20 that were employed at Round Rock or Nashville or
21 McGregor?  Well, not McGregor, but Round Rock or
22 Nashville?  Is that fair?
23  A  Yes.
24  Q  Okay.  Going back to Exhibit 1,
25 Ms. Atsumi, let me – a few of these, I think,

**23**

1 are topics that won't take very long to cover, so
2 let's go back to those.
3  The first topic, number 1, is "The
4 number of total business sales representatives or
5 all non-consumer sales representatives employed
6 at any time during the proposed class period in
7 Oklahoma."
8  Do you see that?
9  A  Yes, I do.
10  Q  Do you have an idea of the number that
11 would be responsive to that topic?
12  A  So currently, the total number of
13 business sales representatives is approximately
14 500.
15  Q  All right.  And that number has
16 dwindled over the course of time since this call
17 center's been open; is that correct?
18  A  Since the Oklahoma City call center has
19 been opened, it has fluctuated both up and down.
20  Q  What is the most -- what's the highest
21 number of business sales representatives that
22 have been employed in Oklahoma City?
23  A  I do not have that specific number at
24 the top of my head.
25  Q  You would be able to get that

**24**

1 information for us; is that correct?
2  A  That information would be attainable,
3 correct.
4  Q  All right.  What would you need to look
5 at to get that information?
6  A  Historical head count reports.
7  Q  The historical head count report, is
8 that a report that's generated out of Round Rock?
9  A  Yes.
10  Q  Have you been asked to produce or
11 create a historical head count report in
12 connection with this case?
13  A  I have been asked to understand what
14 the historical head count has been in the
15 facility.
16  Q  And you've gone to the computer to get
17 that information?
18  A  I have contacted our HR operations
19 organization in Round Rock to have them obtain
20 that information.
21  Q  Who was it that you contacted to get
22 that information?
23  A  My initial contact was with Kelly
24 Matheny, K-E-L-L-Y, M-A-T-H-E-N-Y.
25  Q  What's Ms. Matheny's title, if you

**25**

1 know?
2  A  I don't know her exact title.
3  Q  But she's employed in the HR operations
4 group in Round Rock; correct?
5  A  Correct.
6  Q  And she looked at some figures and
7 verbally gave you the 500 approximate figure you
8 just referred to?
9  A  No.
10  Q  Okay.  What was your communication with
11 Ms. Matheny?
12  A  So it was a request to generate
13 historical head count information, and the
14 response that I was provided was that that could
15 be generated and they believed that that was
16 information – information was previously
17 consolidated or generated at the request of other
18 individuals.
19  Q  All right.  But she didn't tell you any
20 figures, per se?
21  A  No, ma'am.
22  Q  Just that she had previously generated
23 a report?
24  A  Correct.
25  Q  Did you ask to see the report?

Atsumi, Amy Mai 12-17-2008

26

1    A    No, I did not. It was my understanding
2  that that data was handled through other
3  individuals in our organization.
4    Q    All right. Was it handled in
5  connection with this case? Did she say that?
6    A    It's my understanding that the
7  information was provided to Dell counsel, and I
8  cannot say for certain whether it was with
9  regards to this particular case.
10   Q    Now, you're familiar with the case in
11 Oregon; correct?
12   A    I have heard about it, yes.
13   Q    All right. So it may have been
14 provided in connection with that case; you just
15 don't know?
16   A    Correct. I'm not certain which case.
17   Q    All right. Now, I'll represent to you,
18 in my communications with Dell's attorneys in
19 this case, I've been given figures as high as
20 1,900 for business sales representatives.
21        Do you have any understanding whether
22 at any time Dell employed that many business
23 sales representatives in Oklahoma?
24   A    Say that one more time, just the second
25 half of the question, please.

27

1    Q    Well, I'll represent to you I've had
2  communications with Dell's counsel, obviously,
3  and I've been told a figure as high as 1,900 --
4  and that's just an approximate. I think it a
5  little more than that -- in terms of the number
6  of business sales representatives that we're
7  looking at in this case, because you understand
8  we're not just focusing on current but it does go
9  back several years to the opening of this call
10 center.
11       Does that number sound accurate to you?
12   A    That information may be accurate to
13 include individuals who have since left the Dell
14 organization. At any one given time, there would
15 not have been 1,900 active business sales
16 representatives in Oklahoma City.
17   Q    Okay. And if I'm understanding you
18 correctly, I think you're saying over the course
19 of time with attrition and so forth, the company
20 may have employed about 1,900 total business
21 sales representatives during the period it's been
22 open; correct? And I'm talking about Oklahoma
23 City.
24   A    Understood. If that is the data that
25 you've been provided, I would find it reasonable

28

1  to believe that that could be a reasonable
2  number.
3    Q    All right. And we'd have to go to
4  Ms. Matheny to verify the exact number; is that
5  correct?
6    A    Either Ms. Matheny or somebody within
7  her organization, yes.
8    Q    All right. Do you have any information
9  whether or not that figure would also be accurate
10 for both the Nashville call center and the Round
11 Rock call center?
12   A    I would not be able to answer questions
13 with regard to numbers for Nashville or Round
14 Rock.
15   Q    Okay. You've never seen any documents
16 that would reflect the number of business sales
17 representatives at any of the other facilities?
18   A    Not with regards to specific head count
19 numbers.
20   Q    Okay. Would you assume that the number
21 in Oklahoma City is fairly consistent with the
22 other call centers across the U.S.?
23   A    I would not make that assumption.
24   Q    All right. Number two, the second
25 topic on which you've been designated is "Dell's

29

1  document retention policy or policies which would
2  govern records created and maintained during the
3  proposed class period."
4        Do you see that?
5    A    Yes, ma'am.
6    Q    What is Dell's document retention
7  policy?
8    A    What is it meaning what is the content
9  or -- if could you clarify.
10   Q    Yes. Can you generally tell us what
11 the policy is with respect to retention of
12 documents?
13   A    So generally, Dell has a global
14 document retention policy --
15   Q    Okay.
16   A    -- that defines specific requirements
17 with regards to essential or non-essential
18 documents as defined by the policy in the
19 company. And within that policy, there includes
20 information with regards to required time to
21 retain particular documents dependent on what
22 category those documents fall under.
23   Q    All right. Now, you're aware, are you
24 not, that this case relates to compensation for
25 overtime for business sales representatives?

Atsumi, Amy Mai 12-17-2008

34

1  familiar with that term?
2      A   I am familiar with the term.
3      Q   Is that what it's called or do you call
4  them W-O-W?
5      A   We call them WOW.
6      Q   Are those records essential or
7  non-essential, ma'am?
8      A   I do not know.  I imagine it depends.
9      Q   And you don't know, then, the
10 particular document retention policy regarding
11 those documents, do you?
12     A   No, I do not.
13     Q   All right.  Do you know who we would
14 need to talk to to determine that?
15     A   No, I do not.
16     Q   By the way, did you review any
17 personnel files, KRONOS records, CCO records, or
18 WOW tickets in preparation for your deposition
19 today?
20     A   No, I did not.
21     Q   All right.  What about the policies
22 that you did review in preparation for the
23 deposition today?  Are those considered essential
24 or non-essential documents?
25     A   Please repeat the question one more

35

1  time.
2      Q   The policies that you referenced
3  earlier that you reviewed in preparation for
4  today's deposition, are those considered
5  essential or non-essential documents?
6      A   I do not know.
7      Q   And you don't know what the document
8  retention policy is with respect to those
9  policies?
10     A   Not the particular ones I reviewed.
11     Q   All right.  Let's talk about the third
12 topic, "Dell's method of calculation of overtime
13 worked by each business sales representative
14 employed at any time during the proposed class
15 period in Oklahoma."
16         Do you see that?
17     A   Yes, I do.
18     Q   All right.  Generally, can you tell us
19 how Dell – what procedure Dell would use to
20 calculate overtime for the Oklahoma business
21 sales representatives?
22     A   So the calculation utilized for
23 overtime for business sales representatives
24 includes two portions.  The first portion is an
25 overtime payment based upon hours worked related

36

1  to the base salary.
2      Q   Okay.
3      A   And the second portion relates to
4  overtime hours worked in relation to incentive
5  attainments.  Sometimes we'll refer to that as
6  incentive overtime.
7      Q   That would include things such as air
8  points, for example?
9      A   I'm not certain if it includes air
10 points.
11     Q   All right.  The air points is an
12 incentive program, though, isn't it?
13     A   It was one.  I'm not certain that it
14 still exists today.
15     Q   Okay.  So do you think the calculation
16 for air points would fall under the second
17 portion, then, rather than overtime payments
18 related to hours worked on base salary?
19     A   If it was included as part of the
20 incentive calculation, it would fall under that
21 portion of the calculation rather than the base
22 overtime portion of the calculation.
23     Q   And are both these calculations based
24 upon a half time rate of overtime compensation?
25     A   Could you please repeat that question?

37

1      Q   Are both the two portions you
2  referenced in terms of calculation of overtime,
3  both of those are calculated on a half rate based
4  upon a fluctuating work week; correct?
5      A   That is correct, knowing that the base
6  salary covers the full rate also that covers
7  overtime hours worked.
8      Q   In other words, business sales
9  representatives — none of the business sales
10 representatives with Dell, at least the ones
11 you're familiar with in the Oklahoma City call
12 center, none of them have ever been compensated
13 on a time and a half overtime basis, have they?
14     A   So they do receive in total time and a
15 half pay, and their base salary covers the time,
16 and then the additional formulas which I just
17 described cover the half time portion.
18     Q   Okay.  But just in terms of their
19 overtime compensation, ma'am, the overtime is
20 never calculated using a time and a half figure,
21 itself, is it?
22         Do you understand my question?
23     A   I think so.  If you could repeat it one
24 more time.
25     Q   Just with respect to the overtime hours

Atsumi, Amy Mai 12-17-2008

**62**

1 follow-up communication with that customer.
2    Q   All right.
3    A   So they may not necessarily get that
4 initial contact from the customer directly
5 through the queue.  They may get it from another
6 inside sales representatives.
7    Q   Okay.  Are those individuals that are
8 referred these calls, are they, themselves, on a
9 call queue such that the calls can be transferred
10 to them?
11    A   I believe so, yes.
12    Q   Okay.  Now, do you know what the CC
13 name would be for those folks?
14    A   No, I do not offhand.
15    Q   Okay.  All right.  What is meant by the
16 "salary TI?"  I'm sorry.  There's a salary
17 figure, and I take it that's just the salary this
18 person started at; correct?
19    A   Base salary, correct.
20    Q   Okay.  And then we've got under that
21 "sales TI."  What is that?
22    A   It stands for -- TI stands for target
23 incentive.
24    Q   And then TTC, is that total
25 compensation?

**63**

1    A   Total targeted compensation, correct.
2    Q   All right.  And it appears, at least
3 from Exhibit 3, that Mr. Moore was not eligible
4 for bonus when he was hired; correct?
5    A   Correct, not for the corporate bonus
6 plan.
7    Q   And neither was Ms. Ricketts; correct?
8    A   Correct.
9    Q   Then under "shift," what is meant by
10 "shift"?
11    A   "Shift" is often an indicator to
12 utilize for any specific shift differentials,
13 such as third shift or -- more commonly third
14 shift.
15    Q   What is third shift?
16    A   Customarily, third shift would be
17 individuals who are scheduled to work late
18 evening hours.  And I believe -- I don't know the
19 specific time.  It might vary by business --
20 business unit.  But typically it's in the
21 evenings through to the early mornings.
22    Q   All right.  Are the individuals that
23 are on third shift also considered -- I mean,
24 that encompasses some business sales
25 representatives; correct?

**64**

1    A   I'm not aware of business sales
2 representatives that are required to work third
3 shift.
4    Q   Is that a consumer sales rep?
5    A   Oftentimes -- more often than not,
6 third shift individuals are for technical support
7 or customer care divisions.
8    Q   All right.  Now, looking at Exhibit 3
9 and Exhibit 4, can you tell whether or not
10 Mr. Moore and Ms. Ricketts were full-time
11 employees?
12    A   Yes, I can.
13    Q   And does that mean they were working 40
14 hours a week?
15    A   I believe that our definition of full
16 time is 35 hours plus per week, or more per week.
17    Q   Okay.  And 35 hours plus per week, is
18 that set up in shifts or how would Dell schedule
19 the workday for these folks?
20    A   It depends on which sales group they
21 work under.
22    Q   All right.  How does it depend on which
23 sales group they'd work under?
24    A   So we have some sales groups that are
25 scheduled specific shifts with start and end

**65**

1 times.
2    Q   Uh-huh.
3    A   We have other sales representatives who
4 are, in general, expected to be at work during
5 designated work hours but they might not be
6 scheduled, per se, a specific shift start or end
7 time.
8    Q   Can you tell from looking at
9 Ms. Ricketts' and Mr. Moore's what appear to be
10 their new hire cover sheets, whether or not they
11 were individuals working a scheduled 40 hour per
12 week or some lesser amount?
13    A   I'm not able to tell that specifically
14 from this document, Exhibit 3 or 4.
15    Q   What would we need to look at to tell
16 us if these individuals or any other business
17 sales representative was scheduled to work less
18 than 40 hours a week, if you know?
19    A   I don't know specifically.
20    Q   The individuals that are scheduled to
21 work less than a 40-hour week, those individuals,
22 they're also compensated using the same half time
23 rate for overtime; is that correct?
24    A   They're compensated in the same manner
25 that all of our salaried non-exempt sales

Atsumi, Amy Mai 12-17-2008

66

1 representatives are compensated.
2    Q    Using the fluctuating work week?
3    A    Correct.
4    Q    All right.  Are you familiar with why
5 Dell chose to compensate its business sales
6 representatives using the fluctuating work week,
7 ma'am?
8    A    No, I don't know why specifically.  I
9 wasn't here -- employed at the time they made
10 that decision.
11    Q    Do you know who was responsible for
12 making that decision or what department was
13 responsible?
14    A    No, I do not.
15    Q    And what's your understanding of the
16 fluctuating work week, ma'am?
17    A    Could you be a little bit more specific
18 on what you mean by my understanding?
19    Q    Well, do you know what the terminology
20 "fluctuating work week" means?
21    A    So I believe that fluctuating work week
22 is another term utilized to describe salaried
23 non-exempt.  It allows for compensation based
24 upon hours that may fluctuate on any given work
25 week.

67

1    Q    In other words, hours fluctuating below
2 40 hours per week; is that correct?
3    A    Hours fluctuating above 40 hours a
4 week.  So anyone on our fluctuating work week or
5 salaried non-exempt gets compensated, at minimum,
6 for the full 40 hours.
7    Q    Is it your understanding that in order
8 to use a fluctuating work week method of
9 calculation of overtime that the individual has
10 to work less than 40 hours a week?
11        MR. FOX:  I'll object to that to the
12 extent it calls for a legal conclusion.
13    Q    (By Ms. Waters) Do you understand my
14 question?
15    A    I didn't, actually.
16    Q    Okay.  And you don't have any legal
17 training; correct?
18    A    No.
19    Q    And you don't have any specific
20 training through Dell on FLSA or overtime wage
21 and hour issues, do you?
22    A    No.
23    Q    Tell me how you first learned about the
24 term "fluctuating work week," ma'am.
25    A    So the specific term "fluctuating work

68

1 week"?
2    Q    Uh-huh.
3    A    I learned it while being employed at
4 Dell.
5    Q    And what was the circumstance in which
6 you heard that term and learned about it?
7    A    In association with the explanation of
8 how salaried non-exempt worked at Dell.
9    Q    When did you receive this explanation
10 of how salaried non-exempt worked?
11    A    I don't recall the specific date.
12    Q    Has it been recently?
13    A    I've known probably within the last two
14 years.
15    Q    And was this in connection with a
16 conversation with any of your supervisors, or how
17 did this come up, if you recall?
18    A    Came up through talking to one of the
19 individuals on our compensation team at Dell when
20 I first took the role in Oklahoma City as the
21 human resources leader.
22    Q    And by the way, when was that time
23 frame that you took that role as human resources
24 leader?  And that's the position you hold now;
25 correct?

69

1    A    Correct. I hold the human resources
2 leader, but my current responsibilities include
3 more than just Oklahoma City.
4    Q    And that's fair enough.  All right.  So
5 when were you promoted to take that role as a
6 leader?
7    A    Beyond Oklahoma City or just for
8 Oklahoma City?
9    Q    Well, let's take Oklahoma City first.
10    A    Okay.  Oklahoma City in February of two
11 thousand and -- I'm sorry.  I have to count back.
12 Just one moment -- 2007.
13    Q    Okay.  And then you were promoted to
14 have more responsibility beyond Oklahoma City
15 later?
16    A    Correct.
17    Q    When was that date?
18    A    I don't know the exact date.  I believe
19 it was March 2008.
20    Q    All right.  Did you have the
21 conversation about this fluctuating work week in
22 March 2008?
23    A    No.  It was closer to the February 2007
24 time frame.
25    Q    All right.  And who were you talking

Atsumi, Amy Mai 12-17-2008

78

1  Q   Okay.  So I've got it grouped
2  appropriately here?  This is what she should have
3  received as part of her offer letter; correct?
4  A   It's a reasonable -- it's a reasonable
5  assumption, yes, to make.
6  Q   And then the last page, Dell-Davis 54
7  is titled "guarantee option."  Do you see that?
8  A   Yes, I do.
9  Q   And that shows her base salary with her
10  target incentive; correct?
11  A   Yes, ma'am; uh-huh.
12  Q   And then her total target compensation
13  of 27,500.  Do you see that?
14  A   Yes, ma'am.
15  Q   This doesn't reflect any guarantee or
16  anticipated amount she would receive for
17  overtime, does it?
18  A   State that one more time.
19  Q   This doesn't reflect any overtime
20  compensation, does it?
21  A   So it doesn't reflect specific
22  additional compensation for overtime hours
23  worked.
24  Q   Is overtime somehow included in the
25  5,800 incentive?

80

1  week -- fair enough?
2  A   Yes, ma'am.
3  Q   -- she would be due some amount of
4  money above and beyond 21,700?
5  A   Yes.  She would receive -- yes.  She
6  would receive compensation above 21,700 on
7  annualized -- I mean, yes.
8  Q   Okay.  Regardless of whether or not she
9  hit and received any amount of annual target
10  incentive; correct?
11  A   Correct.
12  Q   All right.  Now, is there any reference
13  to how overtime would be paid to her if she
14  earned it in any of the information in the new
15  hire offer letter we're looking at?
16  A   So in the offer letter, there's not
17  specific verbiage referencing additional
18  compensation for overtime hours worked.
19  Q   Is there any reference at all to
20  overtime?
21  A   Specific reference to overtime?  No.
22  Q   All right.  Is there any document that
23  you're aware of that was provided to Ms. Davis or
24  any of the other new hire business sales
25  representatives that talked about compensation

79

1  A   Say that one more time.  I'm sorry.
2  Q   Well, I'm just trying to understand
3  what you just said.
4  A   Okay.
5  Q   This doesn't reflect any wording of
6  overtime compensation, does it?
7  A   No wording of overtime compensation,
8  no.
9  Q   All right.  On any of the figures we're
10  looking at here, base salary, annual target
11  incentive and total target compensation, does
12  Dell consider that they include some amount of
13  overtime?
14  A   For both the base salary of 21,700 and
15  the target incentive of 5,800 are utilized to
16  calculate additional compensation for overtime
17  hours worked.
18  Q   Okay.  But that's not my question.
19  Overtime would be something above and beyond, for
20  Ms. Davis, beyond 27,500; correct?
21  A   It would include additional pay above
22  21,700, but that 21,700 also covers all hours
23  worked, including overtime hours.
24  Q   Okay.  Now, but my question is:  If she
25  works overtime any time more than 40 hours a

81

1  for overtime hours worked?
2  A   So I don't know specifically what
3  Catherine Davis was provided during her new hire
4  training, but that -- she may have received
5  information with regards to how overtime
6  calculations are specifically handled at Dell
7  during her training and on-boarding process at
8  Dell.
9  Q   Okay.  She may have?  It's not a matter
10  of practice that each and every new hire receives
11  the information about how overtime is paid,
12  ma'am?
13  A   So it is a matter of practice.  I'm
14  just speaking on -- from the fact that I wasn't
15  in Oklahoma City in 2005, and so it's reasonable
16  to assume because our practice is is that
17  information is provided, that she would have
18  received it.
19  Q   What is the practice in terms of
20  informing and advising new employees about how
21  overtime is compensated?
22  A   So during new hire training, we have
23  facilitators that give specific information
24  with regards to job duties, responsibilities,
25  expectations of the first few months of

Atsumi, Amy Mai 12-17-2008

90

1  from looking at this if the information here was
2  derived from KRONOS or some other source?
3      A   I cannot tell just from looking at this
4  document.
5      Q   All right.  Now if you look at the
6  totaled amounts, it appears that, at least with
7  respect to the Monday through Friday days,
8  there's a few Saturdays reflected, that Ms. Davis
9  was working at least an eight-hour day; correct?
10     A   According to this report, it appears
11 that way, certainly through any Monday through
12 Friday totals.  There are a couple, as you
13 described, Saturday amounts that are less than
14 eight hours.
15     Q   And at least from this it appears she
16 is working at least 40 hours a week; correct?
17     A   Yes, ma'am, it appears that way.
18     Q   All right.  You mentioned earlier that
19 some of the business sales representatives are --
20 I can't recall what you said specifically, but
21 you said there were some people that were 35 hour
22 a week targeted work weeks.
23     A   No, I didn't say that they were 35 hour
24 a week targeted work weeks.  I had just mentioned
25 that her Dell definition of full time, that may

91

1  include individuals that work less than 40 hours
2  a week.
3      Q   Okay.  As you sit here today, are you
4  aware of business sales representatives in
5  Oklahoma City, either currently or at any point
6  in time, that were assigned schedules amounting
7  to less than 40 hours a week?
8      A   I don't know of any specific
9  individuals that were assigned less than 40 hours
10 a week, again because I don't have intimate
11 knowledge of every individual's schedule, but I
12 am aware of individuals who may have worked less
13 than 40 hours a week.
14     Q   Okay.  On a regular basis?
15     A   That, I don't know for sure.
16     Q   In fact, are you aware of any business
17 sales representatives as you sit here today,
18 ma'am, that are targeted to work less than 40
19 hours per week?
20     A   With the full-time job, no, not
21 scheduled on a consistent basis to work 40 --
22 less than 40 hours a week.
23     Q   Okay.  So they may from time to time if
24 they take a day off, correct, work less than 40
25 hours a week?

92

1      A   Correct.  Or sick or leave early, yes.
2  I mean -- yes.
3      Q   Okay.  Now, aside from the sick days or
4  the vacation days, are you aware of anybody
5  that's working less than 40 hours a week on a
6  regular basis that's a business sales rep?
7      A   That's a business sales rep that's a
8  full-time business sales rep, no.
9      Q   All right.  Now, there's a couple
10 entries I wanted to ask you about here.  I know
11 you said you haven't seen this specific one on
12 Ms. Davis, but I want to see if you can kind of
13 tell us what this is referring to.
14         If you look about a third of the way
15 down on dates to Friday and Saturday, 7-22 and
16 7-23 on the first page of Exhibit 6 -- and that's
17 Dell-Davis 163 -- do you see those two entries?
18     A   Yes, ma'am.
19     Q   It appears that Ms. Davis punched in at
20 10:00 a.m. on the 22nd -- or the 23rd.  I'm
21 sorry.  Do you see that?
22     A   Yes.
23     Q   And then there's another punch in at
24 2:00 p.m.
25     A   Yes.

93

1      Q   Do you see that?  But there's no out
2  punch.
3      A   Yes.
4      Q   But there's a reference to MO?
5      A   Yes, I see that.
6      Q   What is that referring to?
7      A   I don't know what MO stands for.
8      Q   And then it appears, anyway, that --
9  and by the way, the in punch, is this a start
10 time that Ms. Davis would have entered in KRONOS
11 or is this derived from some other source such as
12 her swiping her security pass or something like
13 that?
14     A   So if this is, indeed, a KRONOS report,
15 it would be reasonable to assume that it was
16 Ms. Davis that entered that time.
17     Q   Okay.  And then if you look across the
18 way on "totaled amount" on 7-23, it says "zero."
19 Does this appear to reflect to you that there's
20 an in punch but she's not getting credit for any
21 time worked on Saturday 7-23?
22     A   So I see where it says "zero" for
23 totaled amount, but without understanding what
24 MO means, I can't say for certain whether or not
25 she did or did not receive credit for that date.

Atsumi, Amy Mai 12-17-2008

98

1    Q    That is actually not what 8:00 to 5:00
2    calculates, is it?
3    A    No.
4    Q    And KRONOS, in fact, is set up to
5    deduct an hour for lunch every day; is that
6    correct?
7    A    Yes.
8    Q    Are you aware whether or not -- you're
9    aware from time to time that business sales
10   representatives may work through lunch to attend
11   trainings and things of that sort?
12   A    I'm aware that there may be reasons why
13   sales representatives might work through their
14   lunch hour or a portion of their lunch hour.
15   Q    All right. Are you aware of Dell in
16   Oklahoma City doing any type of audit to go back
17   and compensate their business sales
18   representatives for that period of time worked
19   during those lunches?
20   A    So I'm not aware of any particular
21   audit, although we make it very clear to all
22   sales representatives in the business sales
23   division that it's their responsibility to ensure
24   that their KRONOS entries are accurate, which
25   means if they worked through their lunch period

99

1    or a portion of their lunch period, it's their
2    responsibility to punch in and out accordingly or
3    to reflect that in their KRONOS records so that
4    they can be compensated for that portion worked.
5    Q    Okay. Now here, though, Ms. Davis, at
6    least on our example of July 12th, is entering
7    time of 8:00 a.m. to 5:00 p.m. with no in and out
8    for lunch; correct?
9    A    Not that I can see in this report.
10   Q    But nonetheless, KRONOS is set up to
11   deduct from those entries the one hour for lunch;
12   correct?
13   A    Correct.
14   Q    What would Ms. Davis or anybody else,
15   for that matter, who worked sometime during their
16   lunch break, have to do to go back in to make
17   sure KRONOS adds back in the time they worked
18   during lunch?
19   A    So an individual can go back into the
20   KRONOS system and enter in -- or adjust either
21   their start time, their end time, or add in
22   punches in and out to reflect accurate working
23   times.
24   Q    All right. And that would be through a
25   WOW ticket; is that correct?

100

1    A    I believe that if -- if they have not
2    already passed the required submission date for
3    KRONOS for that pay period, they are able to go
4    in directly into KRONOS and enter in that
5    information.
6    Q    Okay. All right. Now, as you look at
7    this printout, though, I'll represent to you each
8    of these time entries has deducted the hour lunch
9    except those that are shorter than an eight-hour
10   day.
11       So does this appear to you to say that
12   Ms. Davis never, in fact, worked any period of
13   time during her lunch break?
14   A    So while on the surface it may appear
15   that way, individuals can -- as they adjust their
16   in time or their out time, they can adjust it to
17   reflect total hours worked.
18       So hypothetically, an individual who
19   may have worked through 30 minutes of their lunch
20   break could punch an out time of, say, 5:30
21   rather than 5:00 to reflect the additional 30
22   minutes of time worked in the total day.
23   Q    Okay. So that's yet another mechanism
24   other than the WOW ticket whereby they could get
25   compensated --

101

1    A    Directly to --
2    Q    -- for hours work?
3    A    -- into KRONOS, correct. They could
4    either do that directly into KRONOS or they could
5    submit a WOW ticket if the KRONOS system had
6    already locked for that pay period.
7    Q    When does it lock for the pay period?
8    A    I can't remember the specific dates. I
9    believe it is a Tuesday before the -- I don't
10   know specifically what the cut-off date is.
11   Q    Okay.
12   A    I would only be speculating or
13   guessing.
14   Q    This report was printed on January
15   17th, 2008, at least from the entry at the top
16   right there.
17   A    That's what it says, yes.
18   Q    So any adjustments that Ms. Davis may
19   have made or attempted to make to compensate for
20   any hours she may have worked, hypothetically,
21   during her one-hour lunch period, these should be
22   reflected in this printout; correct?
23   A    I believe so. However, I don't know
24   for certain whether or not any adjustments made
25   through a WOW ticket are captured in this report.

Atsumi, Amy Mai 12-17-2008

102

1    Q   Okay.  What other reports, then, would
2  Dell utilize to come up with total hours worked
3  aside from these time detail printouts, ma'am?
4    A   I suspect payroll reports.
5    Q   Okay.  And are those generated from
6  KRONOS or is that some different system?
7    A   I don't know all the systems they use
8  specifically in our payroll department.
9    Q   Okay.  So you really don't know that
10 the payroll reports are going to capture that
11 time, do you?
12   A   So I would imagine our payroll
13 department captures whatever they need to capture
14 to ensure individuals are paid appropriately.
15   Q   Okay.
16   A   But again, I don't know specifically,
17 in your hypothetical situation, if she had
18 submitted WOW tickets or an individual submits
19 WOW tickets, whether or not it's captured on
20 something like this time detail report.
21   Q   Okay.  Now, other than the individual
22 going and making a specific effort to generate a
23 WOW ticket or log in time beyond the time period
24 they stopped working for the day to capture hours
25 worked at lunch, does Dell do anything

103

1  affirmatively to capture the time these
2  individuals may have worked during their lunch
3  break?
4    A   So I believe there are some managers
5  that will go back and remind their team members
6  to ensure that their time is accurately captured
7  in KRONOS, but systematically, in answer to your
8  question, no.
9    Q   Okay.  I mean, the managers may go back
10 and tell them "Go back and adjust this yourself,"
11 but they're not telling HR to do it for the
12 people, are they?
13   A   Correct.  Human resources does not
14 enter KRONOS time for employees.
15   Q   All right.  Do you know who was
16 responsible for programming KRONOS to
17 automatically deduct one hour for the in and out
18 punched time?
19   A   No, I do not know the name of the
20 individual responsible for that programming.
21   Q   Do you know if that's in the HR group
22 that decision may have been made or was that
23 something from finance?
24   A   That, I don't know.
25   Q   Other than the time detail record —

104

1  well, what records are utilized by Dell when
2  coming up with total hours worked for purposes of
3  calculating overtime, ma'am?
4    A   Repeat that question one more time,
5  please.
6    Q   Yes.  What records does Dell look at to
7  determine total hours worked when it's going
8  through its overtime calculation?
9    A   I believe that the records utilized are
10 from our KRONOS system which is our official time
11 keeping system.
12   Q   So what we're looking at would be the
13 report used?
14   A   Assuming this came out of KRONOS, yes.
15 But again, I'm not familiar with exact KRONOS
16 report formats, so I can't vouch for certain that
17 this is a KRONOS report.
18   Q   Okay.
19       (Plaintiff's Exhibit Number 7
20       marked for identification and made part
21       of the record)
22   Q   (By Ms. Waters) I'm showing you what
23 we've marked as Exhibit 7 which appears to also
24 be a time detail printout.  Would you agree?
25   A   Yes, it appears that way.

105

1    Q   Are you familiar with an esaunders?
2    A   No.  Is -- no.  I don't know if that's
3  a name or if that's a report name or an
4  individual's name.
5    Q   All right.  This one, Exhibit 7, I'll
6  represent to you is for another plaintiff in this
7  our case, Joshua Clanton.
8    A   Okay.
9    Q   Do you see that?
10   A   I see the employee name Joshua Clanton
11 on the first page, yes.
12   Q   It's a little bit different format
13 between Exhibit 6 and Exhibit 7, and I just want
14 to ask you:  If you know, what's the reason for
15 the different format here on the time detail?
16   A   I don't know what would be the reason.
17   Q   And looking through Mr. Clanton's time
18 records -- and this one's pretty long -- but it
19 appears he was working eight-hour days; correct,
20 or more?
21       MR. HAHN:  Can we take a break and that
22 will give her a chance to review it?  I need to
23 run to my car.
24       MS. WATERS:  Sure.  We'll be happy to
25 do that.

Atsumi, Amy Mai 12-17-2008

114

1  up for having worked through lunch or, in fact,
2  if he actually worked 30 minutes past his shift
3  ending?
4      A   So I don't know if it's easy to
5  determine that specifically just by looking at
6  the numbers on this report.
7      Q   Well, aside from this report, is there
8  anything you could look at at Dell that would
9  tell us on a particular date what the 30 minutes
10  extra past the shift was for, whether it be
11  working past the shift by 30 minutes or making up
12  for time worked during lunch?
13      A   I don't believe that there's a report
14  that I could look at that would --
15      Q   Is there anything could you look at?
16      A   -- determine for certain.  I would
17  imagine you could take a look at whether or not
18  Mr. Clanton actually worked within an appropriate
19  sales tool or handled a customer inquiry during
20  that designated lunchtime, but I don't know if
21  it's captured in the systematic report.
22      Q   Okay.  In other words, you'd have to go
23  to his computer and see if he actually logged off
24  at 6:30 as opposed to 6:00?
25      A   Or booked any business with a customer,

115

1  correct.
2      Q   Okay.  Now, if an individual -- sales
3  representatives that are working on the queue,
4  are they encouraged to arrive prior to their
5  shift start time?
6      A   So they're encouraged to be ready to
7  work at the start of their shift.
8      Q   And are they encouraged to come early a
9  specified amount of time in order to ready
10  themselves for beginning the shift?
11      A   Not that I'm aware.
12      Q   There's no stated policy that you need
13  to arrive 30 minutes or 15 minutes early?
14      A   No.
15      Q   But there is the policy that you need
16  to be prepared to start work right at the
17  beginning of your shift?
18      A   Correct.
19      Q   And you'd agree with me, wouldn't you,
20  that there's a time period that is required to be
21  ready at the start of the shift?
22          In other words, you've got to turn on
23  your computer and log in; correct?
24      A   I would make the assumption that, yes,
25  you have to turn on your computer.

116

1      Q   And that's a pretty short period of
2  time for it to boot up; right?
3      A   Yes, yes.
4      Q   And the employees are told they need to
5  have the computer ready and booted up at the
6  beginning of the shift; correct?
7      A   They should.
8      Q   And they also have to log into the
9  phone system; is that correct?
10      A   Or be ready to take a call, yes, at the
11  beginning of their shift.  Now, I think that the
12  time required to actually log into your phone
13  system is a very short amount of time.
14      Q   Has Dell done any kind of analysis of
15  that time that's involved for the logging in to
16  the computer, getting the computer ready, and the
17  logging in to the phone system, how much of a
18  period of time that takes before a shift begins?
19      A   I'm not aware of any such analysis.
20      Q   Okay.  Do you have any idea, just
21  personally from your experience at Dell, how much
22  time that all takes?
23      A   So from my personal experience, it
24  probably takes no more than a few minutes.
25      Q   Okay.

117

1      A   I theoretically could be ready to start
2  my workday at 8:00 and turn on my computer at
3  7:59 and log in my phone and be ready at 8:00 to
4  take a call.
5      Q   Okay.  And the individuals here that
6  we're looking at, specifically Mr. Clanton
7  because you've looked at his report in Exhibit 7
8  in detail, is he capturing that time prior to the
9  beginning of his shift, or can you tell that from
10  looking at his detailed time report?
11      A   So I can't know for certain what
12  Mr. Clanton did at exactly upon arrival at his
13  desk on each date.
14          There are days that have a start time
15  of, for example, 15 minutes prior to 8:00 where I
16  don't know if he utilized that time to get
17  himself ready or he actually started handling
18  customer inquiries, but certainly he documented
19  time earlier than, say, an 8:00 start time to
20  ensure that he was compensated for that.
21      Q   Okay.  So you think that the times
22  here, at least on Dell-Davis 170, for example,
23  that are entries prior to 8:00 a.m., that would
24  have been Mr. Clanton logging in prior to the
25  shift beginning?



IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

HITUL GANDHI, individually  )
and on behalf of a class of  )
others similarly situated,  )
                             )
          Plaintiff,         )
                             )
vs.                          )   No. A-08-CA-248-JRN
                             )
DELL INC., and DELL          )
MARKETING USA, L.P.,         )
                             )
          Defendant.         )
_____

CATHERINE L. DAVIS and TOMMY )
MOORE, Individually and on   )
Behalf of others similarly   )
situated,                    )
                             )
vs.                          )   No. A-08-CA-794-JRN
                             )
DELL, INC. d/b/a DELL        )
COMPUTER, INC., a Delaware   )
corporation, DELL USA L.P.,  )
a Texas Limited Partnership  )
and DELL MARKETING L.P., a   )
Texas Limited Partnership,   )
                             )
          Defendant.         )

Machniski, Jene  12-17-2008

**2**

```
 1
 2
 3           DEPOSITION OF ADELE JENE MACHINSKI
 4         TAKEN ON BEHALF OF THE PLAINTIFFS
 5            IN OKLAHOMA CITY, OKLAHOMA
 6              ON DECEMBER 17, 2008
 7
 8
 9
10
11
12
13   Reported by:  Elizabeth Caudill, CSR, RMR, CRR
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                   CONTENTS
 2                        Page  Line
 3   Direct Examination by Ms. Waters . . . . 6   6
 4   Jurat Page . . . . . . . . . . . . . . . 71
 5   Witness Signature Page . . . . . . . . . 72
 6   Reporter's Certificate. . . . . . . . . 73
 7
 8
            PLAINTIFF'S INDEX OF EXHIBITS
 9
                         Page  Line
10
11   Exhibit 1 . . . . . . . . . . . . .  14    17
12   Exhibit 2 . . . . . . . . . . . . .  22    11
13   Exhibit 3 . . . . . . . . . . . . .  28     7
14
15
16
                      * * * * * *
17
18
19
20
21
22
23
24
25
```

**3**

```
 1       A P P E A R A N C E S
 2   For the Plaintiff: Allison B. Waters
              Attorney at Law
 3            10205 North Pennsylvania
              Oklahoma City, Oklahoma 73120
 4
 5       Matt Dameron
              Attorney at Law
 6            460 Nichols Road
              Suite 200
 7            Kansas City, Missouri 64112
 8   For the Defendant:  Michael W. Fox
              Attorney at Law
 9            301 Congress Avenue
              Suite 1250
10            Austin, Texas 78701
11
12       Christopher Hahn
              2801 Via Fortuna
13            Suite 100
              Austin, Texas 78746
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1       S T I P U L A T I O N S
 2       IT IS HEREBY STIPULATED AND AGREED by
 3   and among the attorneys for the respective
 4   parties hereto that the deposition of ADELE JENE
 5   MACHINSKI may be taken on behalf of the
 6   PLAINTIFFS on DECEMBER 17, 2008 in Oklahoma City,
 7   Oklahoma, by Elizabeth Caudill, Certified
 8   Shorthand Reporter within and for the State of
 9   Oklahoma, pursuant to Notice and the Federal
10   Rules.
11            * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Machniski, Jene  12-17-2008

46

1  to be tighter that "We need you here at -- you
2  need to be taking calls at 7:00.  If you're not
3  here till 7:10, that's a problem."
4      Q   If the person's shift, for example,
5  starts at 8:00 and they arrive right at 8:00 but
6  they're not ready to take calls at 8:00 because
7  they're booting up and getting their phone system
8  turned on, et cetera, does that constitute a
9  tardy, generally?
10     A   They get in at 8:00?
11     Q   Yes.
12     A   Then it would not be.
13     Q   It would not be.  Okay.  Just so long
14  as they're physically at their desk, it's not
15  considered a tardy?
16     A   Correct.
17     Q   Now, there's also a reference, also
18  includes "Leaving the assigned work area or
19  leaving the building without approval from a
20  member of management."
21         Is the individual able to leave the
22  queue to take breaks or get things from the
23  printer?
24     A   Absolutely.
25     Q   Okay.  What does "leaving the assigned

47

1  work area" when you see it in a warning of this
2  sort typically mean?
3      A   This -- so this is like the generic
4  overall what's in the Dell attendance policy?  My
5  assumption -- and if a manager came to me and
6  said "This is what happened," would be someone
7  getting up at their desk and working away -- and
8  walking away, not to go to the printer but just
9  leaving.
10     Q   Okay.  For a period of time --
11     A   Correct.
12     Q   -- without being able to take calls?
13     A   Correct.
14     Q   And Dell's time away from work
15  requirement, that's a written policy from a
16  personnel handbook?
17     A   Not a personnel handbook, but this is
18  available -- this piece is available to managers
19  on a website.
20     Q   Now, the time that we're looking at
21  here, do you have an understanding from looking
22  at the acronyms beside these dates under the
23  "Description of conduct" under Mr. Clanton,
24  whether or not these things are compensable time
25  or not?

48

1      A   Are we paying him for this time?
2      Q   Yes.  That's my question.  Thank you.
3      A   Yes, he would be paid for this time.
4      Q   Why would he be paid for this time?
5      A   He would -- the only exception would be
6  if any of this was, like, for a full week absence
7  and he wasn't utilizing any of these codes, but
8  PBA is paid time off.
9      Q   Okay.
10     A   And even if he had exhausted -- as long
11  as he was there for the week, he'd still be paid.
12     Q   All right.  Is it your understanding
13  that when individuals enter time into KRONOS,
14  they have a log-in time and then a log-out time;
15  is that correct?
16     A   I'm not sure if it's called log-in
17  time.  They have a -- there's a time to enter the
18  time I'm here and the time I leave.
19     Q   Okay.  And has that always been subject
20  to manual entry into KRONOS?
21     A   The employee has to enter it into
22  KRONOS, yes.
23     Q   Okay.  It's not connected in any way
24  either to the phone or to the computer being
25  booted up or anything along those lines?

49

1      A   That's correct.
2      Q   And what about the log-off time, is
3  that also a manual log-off time?
4      A   It's manual for the employee to go into
5  KRONOS and say "This is what time I left for the
6  day."
7      Q   Okay.  Is that the same thing as the
8  hours being calculated for the person being
9  worked that day?  Does that make sense?
10     A   What the employee enters as the time I
11  began work and the time I end work?
12     Q   Uh-huh.
13     A   That is the time that they're paid for.
14     Q   Okay.  There's been some suggestion in
15  this case about KRONOS deducting one hour for
16  lunch.
17         Are you aware that KRONOS deducts
18  automatically one hour for lunch every day?
19     A   Yes.
20     Q   Okay.  And that's something that's been
21  preset in the KRONOS programming by Dell;
22  correct?
23     A   Yes.
24     Q   Is there a policy with regard to if an
25  individual does a work through lunch, you know,

Machniski, Jene  12-17-2008

**50**

1  for example, if they attend a training or
2  something like that, whereby they can get
3  compensated for either all or a part of the time
4  they worked during lunch?
5      A   Yes.  They should enter -- they should
6  record the actual time that they worked, and if
7  they worked through lunch, they should record
8  that they worked through lunch.
9      Q   How are they able to record that they
10 worked through lunch?
11     A   It's through the KRONOS tool.
12     Q   And do you know how that's done through
13 the KRONOS tool?
14     A   I don't specifically know how to do it
15 because I've never had to do it, but my
16 understanding, you -- it's -- I think you sign
17 in, you sign out, you sign in, you sign out
18 again.
19     Q   Okay.
20     A   But I'm not 100 percent because I've
21 never had to do it or I don't know if there's an
22 exception button or something to take it away.
23     Q   Okay.  Now, is there a way to stop
24 KRONOS from deducting the hour?
25     A   I don't know.

**51**

1      Q   Who would I need to ask about that?  Is
2  that the KRONOS management people, or what
3  division or department?
4      A   I don't know.  I would assume someone
5  that has ownership for KRONOS.  And I just don't
6  know that, who that is.
7      Q   Okay.  Are you physically working in
8  the same vicinity as business sales
9  representatives on a queue, ma'am?
10     A   I'm in the same building.
11     Q   Are you on a different floor?
12     A   Yes.
13     Q   Okay.  So you don't really observe
14 these folks as they're doing their daily duties
15 and taking phone calls, do you?
16     A   Sometimes.
17     Q   Are you aware that Dell, from time to
18 time, or frequently, really, brings in lunch for
19 the individuals to do some training about
20 products that are being offered?
21     A   Yes.
22     Q   Okay.  Is there any tracking of how
23 often that's done and what days that's done?
24     A   Not that I'm aware of.
25     Q   Is there any way we could determine,

**52**

1  for example, if you look at a particular week on
2  a calendar in any given week during the year,
3  what events took place during the lunch hour that
4  week?  Is there any way we could find this
5  information out?
6      A   I don't know.
7      Q   You don't know --
8      A   I don't know because I don't know if
9  they keep records of it.  I just don't know.
10     Q   Do you have any idea who would
11 coordinate lunches being brought in for sales
12 representatives?
13     A   It is generally someone within the
14 business.  I don't know if it's always the same
15 individual, if it's the -- I don't know who
16 brings it in, honestly, or who coordinates it.
17     Q   Okay.  And when you say "somebody
18 within the business," are you talking about
19 somebody within the business segment?
20     A   So for SMB, someone within SMB.  If it
21 was the channels group, someone within the
22 channels group.  If it was EPP or the ATG group,
23 somebody within that group.
24     Q   Okay.  And are you aware whether or not
25 Dell makes any effort in its time keeping

**53**

1  mechanism to reprogram KRONOS on the days that
2  those presentations are being made during the
3  lunch hour?
4      A   To reprogram KRONOS?
5      Q   Yes, such that it's not going to deduct
6  the hour for lunch.
7      A   I don't know.
8      Q   You're not aware of that happening, are
9  you?
10     A   No.
11     Q   Is Dell essentially leaving it up to
12 the employees who attended those trainings during
13 lunch to correct the deduction of time being made
14 for the lunch hour?
15     A   The direction always to the employees
16 is to "Record all hours worked.  And if you work
17 through lunch, make sure you record that you work
18 through lunch."
19     Q   Okay.  In the training materials, is
20 your group and the various -- well, in your new
21 hire orientation, for example, are you letting
22 them know that an hour is going to be deducted
23 unless they report working during that time?
24     A   I don't know, because I don't know if
25 we talk about KRONOS.  I can't recall talking

Machniski, Jene  12-17-2008

54

1 about KRONOS in the new hire orientation.
2     Q   Do you know who's responsible for doing
3 any presentations on KRONOS?  I mean, you're
4 aware that some KRONOS presentations are done.
5     A   Yes.
6     Q   But you're not aware whether or not
7 they present that information about the deduction
8 for lunch?
9     A   My assumption is that it is.
10    Q   But you don't know for sure?
11    A   I'm pretty sure, because just every
12 conversation that -- that I've had with an
13 employee or that I've heard managers talk about
14 or when they're having the lunches --
15    Q   Uh-huh.
16    A   I don't ever recall sitting in on a
17 training session, though, where they're talking
18 about KRONOS and saying "Make sure that you're
19 doing this."
20    Q   Okay.  You don't ever recall being
21 present during that --
22    A   Right.
23    Q   -- and talking about that particular
24 issue?
25    A   Correct.

55

1     Q   And you have sat through these training
2 sessions before; correct?
3     A   I sat through new employee orientation
4 as a new employee, and I don't remember
5 everything that was talk -- and I don't remember
6 being -- talking about KRONOS in that time.  I
7 just know that it happened -- that it happens.
8         I don't -- you know, I haven't sat -- I
9 don't sit through every new -- I don't sit
10 through any of the new employee orientations,
11 actually, after my own.
12         I'll come in and observe pieces of it,
13 but -- so I don't think it's a new employee
14 orientation, but I'm really not sure.
15    Q   Let's talk about just training sessions
16 in general or team meetings that may occur during
17 the business day.  It's my understanding the
18 queue folks, there's maybe 10 to 15 of them that
19 report to a manager; correct?
20    A   That's correct.
21    Q   And then you have several different
22 managers, and they're all reporting up to an ISR.
23 Is that accurate?
24    A   ISM, yes.
25    Q   ISM.  Okay.  And from time to time,

56

1 there's going to have to be a huddle of the
2 manager with the folks on his queue -- his or her
3 queue; correct?
4     A   Yes.
5     Q   Does Dell generally request that those
6 take place either before the shift starts or
7 afterward?  Or what's the policy, if you know?
8     A   No policy.  We do expect that our
9 managers have team meetings, huddle with the
10 teams, are usually during the workday --
11    Q   Okay.
12    A   -- is my understanding.
13    Q   Is there time that's built into the
14 shift to take this team off line during the shift
15 and make them unavailable for calls so they can
16 have their huddle?  I'm assuming they can't have
17 the huddle and be taking calls; correct?
18    A   Correct.
19    Q   Because the manager needs to speak to
20 everyone?
21    A   Correct.
22    Q   So are you saying they're going to take
23 time off the queue to have their huddle or do you
24 think it's really happening sometime after the
25 shift's over?

57

1     A   So each team does have team meetings.
2 They have a certain period of time that they
3 have -- the team meeting is built into the
4 schedule, into the day.
5     Q   Okay.
6     A   Don't know the frequency.
7     Q   Do you have any idea how often those
8 team meetings are held?  I mean, are we talking a
9 weekly?  Bi-weekly?  What's your understanding?
10    A   Depends on time of year and the call
11 volume, but I believe a general guideline would
12 be bi-weekly.
13    Q   Okay.  What are factors that would
14 cause that to either increase or decrease based
15 upon the time of year?
16    A   Call volume.
17    Q   Do the meetings go up if there's more
18 call volume?
19    A   Go down.
20    Q   Because you're trying to handle making
21 sure you have enough coverage; is that correct?
22    A   Correct.
23    Q   All right.  But generally speaking, if
24 you're kind of dealing with normal call volume,
25 it's not a spike, you're looking at probably

Machniski, Jene  12-17-2008

66

1    Q    And this training is before they've
2  ever even gotten on the queue and started
3  working; correct?
4    A    Yes.
5    Q    Is it reiterated at any point in time
6  after the individual's worked there, for example,
7  six months or a year or anything of that sort?
8    A    I don't know.  I mean, I'm sure that it
9  is, and I have seen some managers do it, but I --
10  I don't think there's a formal presentation that
11  goes back out after that.
12    Q    That's sort of just handled on a
13  team-by-team basis if they discuss it or not?
14    A    That would be my assumption.
15    Q    Okay.  You're certainly not telling
16  them, "Hey, we need to do a six-month overview so
17  they understand how overtime is calculated";
18  correct?
19    A    No.
20    Q    And nobody's telling you to tell them
21  that; right?
22    A    No.
23    Q    All right.  Pre- and post-shift duties,
24  you would agree if it takes someone 15 minutes to
25  get prepared for their shift, if it's an 8:00

67

1  shift, they need to be arriving at 7:45; correct?
2    A    If it takes them 15 minutes, yes.
3    Q    And then they should commensurately be
4  logging into KRONOS at 7:45 rather than 8:00;
5  correct?
6    A    Yes.
7    Q    And they are told to do that; correct?
8    A    Yes.
9    Q    Are the managers of the queue members
10  at any point in time going in and saying, "Look,
11  you know, we need to only reflect in KRONOS the
12  shift"?
13    A    No.
14    Q    Okay.  You've never heard of anybody
15  discouraging employees to put in pre-shift and
16  post-shift time worked?
17    A    No.
18    Q    Okay.  And you've never heard of anyone
19  discouraging them to try to override the
20  deduction for the lunch hour; correct?
21    A    Discouraging them?
22    Q    Yes.
23    A    No.
24    Q    And you've certainly never done that?
25    A    No.

68

1    Q    Do you consider it discouragement to
2  them that Dell is not actively coming in and
3  monitoring that and adjusting it, itself, when
4  it's allowing presentations to take place during
5  lunch?
6    A    Do I consider that discouragement?
7    Q    Yeah.
8    A    No.
9    Q    I mean, because it is leaving it up to
10  the employee to have to go in and manually
11  override a system that's already in place;
12  correct?
13    A    The employee's responsible for
14  recording their hours worked, including if they
15  worked through lunch.
16    Q    Okay.  But what I'm saying is unless
17  they take the extra step to override, their entry
18  for that day, assuming they worked fully through
19  lunch, is going to be deducted; true?
20    A    If -- if they don't accurately report
21  the hours and they don't record that they were
22  there for lunch, yes, it will be incorrect.
23    Q    Okay.  Are they given a calendar or
24  anything of that sort so they can note down the
25  dates that they're doing some work during lunch

69

1  when they're not on the queue?  Or is there any
2  type of tracking mechanism to assist them in
3  accurate reporting of the hours worked during
4  lunch?
5    A    I don't know.
6    Q    Okay.  You're not authorizing anything
7  to be issued to them to help them along those --
8    A    No.
9    Q    -- lines; right?  And Dell's not even
10  monitoring the days, to your knowledge, on which
11  these activities take place; correct?
12    A    The -- which activities?
13    Q    When you've got lunch coming in or
14  there's trainings happening during lunch.
15    A    I don't think so.
16    Q    Okay.  There's been a change to the
17  consumer sales reps in their compensation.  Are
18  you aware of that?
19    A    I'm aware there was a change.
20    Q    And there was a discussion to change
21  the way the business sales representatives were
22  compensated.  Are you aware of that?
23    A    I am not part of those discussions.
24    Q    You're aware that they occurred,
25  though; right?