IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HITUL GANDHI, individually, and on behalf of | § | |
| a class of others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:08-cv-00248 |
| | § | |
| DELL INC., | § | |
| and | § | |
| DELL MARKETING USA L.P., | § | |
| | § | |
| Defendants. | § | |

**FACTUAL APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION AND MEMORANDUM FOR CERTIFICATION UNDER 29
U.S.C. § 216(B) AND CLASS ACTION CERTIFICATION UNDER FED. R. CIV. P. 23**

Pursuant to Local Rule CV-7, Defendants Dell Inc., Dell USA L.P., and Dell Marketing

USA L.P. ("Dell") file this Factual Appendix in support of its Response to Plaintiffs' Motion and

Memorandum for Certification, including all declarations, deposition transcripts, and other

documents supporting these facts.

## I.       EVIDENCE

The specific evidence supporting the Response is found in:

A.       Declaration of Amy Atsumi

    a.   Attachment 1: Exhibit F to Plaintiffs' Motion

    b.   Attachment 2: Training slides re Kronos

    c.   Attachment 3: "Q2 FY09 SMB Sales Compensation Plan"

B.       Declaration of Michael B. Hudanick

    a.   Attachment A: Job Characteristics Chart

b.  Attachment B: Kronos timekeeping records and advices of deposit for Plaintiffs Moore, Webb, and Clanton

c.  Attachment C: Kronos timekeeping records for Plaintiffs Ricketts, Romriell, and Haley

d.  Attachment D: Kronos timekeeping records for Plaintiff Davis

e.  Attachment E: Kronos timekeeping records for Plaintiff Wojciechowski

f.  Attachment F: Kronos timekeeping records for Plaintiffs Schrouf, Stewart, Snead, Pate, Barker, and Gandhi

C.  Excerpts from the Deposition of Amy Atsumi.

D.  Excerpts from the Deposition of Plaintiff Joshua Barker

E.  Excerpts from the Deposition of Plaintiff Shannon Brothers

F.  Excerpts from the Deposition of Plaintiff Izetta Carson

G.  Excerpts from the Deposition of Plaintiff Catherine Davis

H.  Excerpts from the Deposition of Plaintiff Rasha Dowell

I.  Excerpts from the Deposition of Plaintiff Hitul Gandhi

a.  Exhibit 1: "SMB Sales Compensation Policies and Guidelines FY06"

b.  Exhibit 2: "KRONOS: New Hire Training"

J.  Excerpts from the Deposition of Plaintiff David Haley

K.  Excerpts from the Deposition of Plaintiff Tommy Moore

L.  Excerpts from the Deposition of Plaintiff Michelle Ricketts

M.  Excerpts from the Deposition of Plaintiff Myron Schrouf

N.  Excerpts from the Deposition of Plaintiff Nicholas Stewart

O.  Excerpts from the Deposition of Plaintiff Tracie Webb

P.    Excerpts from the Deposition of Plaintiff Daniel Wojciechowski

Q.    Affidavit of Catherine Davis

R.    Affidavit of Tommy Moore

S.    Declaration of Jeff Londa

Dell also attaches the following unpublished opinions to this Appendix:

T.    <u>Newsom v. NPC Int'l, Inc.</u>, No. 03-2068, slip op. (W.D. Tenn. Sept. 29, 2003)

U.    <u>Brooks v. BellSouth Telecommunications</u>, No. 1:07-cv-3054-ODE, slip op. (N.D. Ga. Feb. 10, 2009)

## II.    UNDISPUTED FACTS

### A.    THE PLAINTIFFS

1.    Plaintiffs are former employees of Dell Marketing USA L.P.  Plaintiffs have chosen to refer to themselves and the individuals they seek to represent as *"business sales representatives."* (Pls.' Mot. at ¶ 1.)  Dell does not use this term to refer to any group of its employees.  (Astsumi Decl. at ¶ 2.)

2.    All of the plaintiffs in this case were employed within the Small and Medium Business Unit ("SMB") of Dell.  (Hudanick Decl. at ¶ 3.)

3.    The SMB Unit is one of four business units at Dell in which sales representatives may work: Large Enterprise, SMB, Public, and Consumer.  As explained in the Hudanick and Atsumi declarations and further below, the various sales representative jobs in these units have widely dissimilar duties, schedules, compensation plans, and working conditions.  (Hudanick Decl. at ¶ 3; Atsumi Decl. at ¶ 8.)

4.    As demonstrated by the chart attached to the Declaration of Michael Hudanick and printed below, the SMB Division contains some 27 different sales jobs in seven subunits. (<u>See</u>  Hudanick Decl. at ¶ 4 & Attach. 1.)  These seven subunits are: the Asset Recovery

3

Business (ARB), the Advanced Systems Group (ASG), the Business Systems Division Transactional (BSDt) group, the Business Systems Division Development (BSDd) group, the Business Systems Division Relationship (BSDr) group, the Mid Markets Division (MMD), and the Americas Transactional Group (ATG).  (Id.)

5.     Attachment 3 to the Declaration of Amy Atsumi, a training document entitled "Q2 FY09 SMB Sales Compensation Plan," shows that the various jobs in SMB have numerous dissimilar compensation plans.  (Atsumi Decl. at ¶ 6 & Attach. 3.)

6.     In addition to having different compensation plans, each job within SMB has significant differences in work schedules, lunch breaks, kinds of accounts handled, responsibilities, and managers, as evidenced by the following chart attached to Mr. Hudanick's Declaration:

| Sales Employee's Job<br>ISR = Inside Sales Representative<br>TSR = Technical Sales Representative | Work on a sales queue | Mostly handle incoming calls | Scheduled by Call Center Ops | Handle large orders | Have assigned accounts | Able to work from home | Have pre-shift huddles | Have set lunch period | Sell computer systems | Sell storage products | Sell software |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Asset Recovery Business (ARB)** | | | | | | | | | | | |
| ARB - ISR | Y | Y | Y | N | N | N | Y | Y | Y | N | N |
| ARB - TSR | N | N | N | N | N | N | N | N | Y | Y | N |
| **Advanced Systems Group (ASG)** | | | | | | | | | | | |
| ASG - BSDt TSR | Y | N | N | N | N | N | N | N | Y | Y | N |
| ASG - BSDr TSR | N | N | N | N | N | N | N | N | Y | Y | N |
| ASG - MMD TSR | N | N | N | N | N | N | N | N | Y | Y | N |
| ASG - POS | Y | Y | Y | N | N | N | N | N | N | N | N |
| **Business Systems Division Transactional (BSDt)** | | | | | | | | | | | |
| BSDt – New Queue- ISR | Y | Y | Y | N | N | N | Y | Y | Y | N | N |
| BSDt-Super queue-ISR | Y | Y | Y | N | N | N | Y | Y | Y | N | N |
| BSDt-Large Order Representative (LOR) | N | N | N | Y | N | N | N | N | N | N | N |
| BSDt-S&P-ISR (Panama only) | Y | Y | Y | N | N | N | Y | Y | N | N | Y |
| BSDt-S&P-LOR | N | N | N | Y | N | N | N | N | N | N | Y |
| BSDt-S&P-software specialist ISR | N | N | Y | N | N | N | N | N | N | N | Y |
| **Business Systems Division Development (BSDd)** | | | | | | | | | | | |
| BSDd-ISR | Y | N | Y | Y | Y | N | N | Y | Y | Y | Y |
| BSDd-TSR | N | N | N | Y | Y | N | N | N | Y | Y | Y |
| **Business Systems Division Relationship (BSDr)** | | | | | | | | | | | |
| BSDr - ISR | N | N | N | Y | Y | N | N | Y | N | Y | N |
| BSDr-S&P ISR | N | N | N | Y | Y | N | N | N | N | N | N |
| BSDr-S&P-Software Specialist-ISR | N | N | N | Y | N | N | N | N | N | N | N |
| BSDr-S&P-Hardware Specialist-ISR | N | N | N | Y | N | N | N | N | N | N | Y |
| **Mid Markets Division (MMD)** | | | | | | | | | | | |
| MMD –Development-ISR | N | N | N | Y | N | N | N | Y | N | N | N |
| MMD-Acquisition-ISR | N | N | N | Y | Y | N | N | Y | N | N | N |
| MMD-Software and Peripherals (S&P)-ISR | N | N | N | Y | Y | N | N | N | N | N | Y |
| **Americas Transactional Group (ATG)** | | | | | | | | | | | |
| ATG–Affiliates (AFF)-ISR | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y |
| ATG – AFF-TSR | N | N | N | Y | Y | Y | N | Y | Y | Y | Y |
| ATG- Product Transactional Group (PTG) ISR | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y |
| ATG –PTG-TSR | N | N | N | Y | Y | Y | N | Y | Y | Y | Y |
| ATG -After Point Of Sale (APOS)-ISR | Y | N | N | N | N | N | Y | Y | N | N | N |
| ATG –Employee Purchase Program (EPP)-ISR | Y | Y | N | N | N | N | Y | Y | N | N | N |

(See Hudanick Decl. at ¶ 4 & Attach. 1.)

7.      In addition to the fact that Plaintiffs worked in different subunits, Plaintiffs also fall into two different general job categories: inside sales representatives (ISRs) and technical sales representatives (TSRs).   (Hudanick Decl. at ¶¶ 5-6.)   For example, Plaintiffs Snead, Stewart, and Webb were TSRs.  (Id. at ¶ 6; Stewart Dep. 11:18-22; Webb Dep. 9:16-20.)

8.      The job of a TSR is fundamentally different than the job of an ISR.  (Hudanick Decl. at ¶ 6.)  Sales jobs involving a sales queue taking inbound calls on a schedule set by Call Center Operations are generally required to be available for inbound calls when their scheduled shift begins.  (Id. at ¶ 5.)  Other sales jobs, including all jobs with assigned accounts, did not have a requirement to be available for inbound calls during a scheduled shift.  (Id.)  Only sales

jobs that predominantly handled inbound calls ever had to "accommodate heavy call volume." (Id.)  Most sales jobs were unaffected by inbound call volume.  (Id.)

9.     ISRs and TSRs are separated into different categories, such as ISR IB, ISR I, ISR II, ISR III, and ISR IV.  (Hudanick Decl. at ¶ 5.)  Several Plaintiffs received promotions and changed jobs from inbound call queues to other subunits within SMB.  (Id.)  For example, Plaintiff Webb testified that she had moved through the ranks from "SR IB" to "SR III," (Webb Dep. at 67:1-9), whereas Plaintiff Moore testified that he was never promoted beyond "SR IB," (Moore Dep. at 69:22-70:4).

10.     The individuals who have opted into this case demonstrate the diversity of jobs encompassed by the phrase "business sales representatives."  For example, Plaintiff Barker testified that he was initially a "new queue" ISR, before being promoted to: "super queue" ISR; Business System Division Transactional (BSDt) software and peripheral (S&P) ISR; Business System Division Relationship (BSDr) S&P ISR; and finally to one of Dell's Large Order Representative (LOR) positions.  (Barker Dep. at 9:11-11:9.)  Although Plaintiff Haley also started out as a new queue ISR and a super queue ISR, he was then promoted to a position as Jaguar Representative and then into the Mid-Market Division as a relationship sales representative.  (Haley Dep. at 16:17-17:12, 20:5-20:20.)[1]  On the other hand, Plaintiff Dowell testified that she was in the Employee Purchase Plan (EPP) group the entire time she was at Dell, a subgroup of the Americas Transactional Group.  (Dowell Dep. at 19:18-20.)

11.     In summary, Plaintiffs' phrase "business sales representatives" refers not to one job but to a broad spectrum of dissimilar jobs in multiple business units.

---

[1] Moreover, when Plaintiff Haley worked as a new queue ISR, he was employed as a contract worker and did not actually become a Dell employee until later.  (Id. at 8:4-11.)

**B.    PLAINTIFFS' CLAIMS**

12.    Dell has deposed fifteen of the Plaintiffs who have joined this lawsuit.  In each lawsuit, Dell's counsel asked the Plaintiff being deposed the reasons why he or she was alleging that Dell owed compensation to him or her under the FLSA.  The responses were markedly different.  For example, Plaintiffs Carson and Dowell are <u>not</u> alleging any "off-the-clock" type of claim:

> Q.    Do you think you were paid -- like if you put down that you worked certain hours, were you always paid at least something for those hours?
> A.    Yes.
> Q.    So it was just you didn't understand how the amount was?
> A.    Correct.
> Q.    In terms of putting the time down, did you put down all the time that you worked?
> A.    Yes.
> Q.    Anyone ever tell you "Don't put down this time" or anything like that?
> A.    No.
> Q.    So you would put down from when you started working till you finished working?
> A.    Correct.

(Carson Dep. at 27:12-28:3.)

> Q.    So -- and that's one of the things that's helpful in the discovery process is to find out what your particular issues are, because different people have different ones.  And your concerns with what went on is the amount you were paid for the overtime?
> A.    Right.
> Q.    Is there anything else?
> A.    No.

(Dowell Dep. at 29:21-30:4.)

13.    Plaintiff Moore, on the other hand, alleges that he performed off-the-clock work for which he was not compensated but does not otherwise allege any violation of law:

> Q.    (By Mr. Fox) What's the basis for your lawsuit against Dell?
> A.    Not being paid for hours worked.
> Q.    Anything else?
> A.    No.

(Moore Dep. at 15:16-20.)

14.     Two Plaintiffs' claims are barred entirely by the statute of limitations.   As admitted in her declaration and as confirmed by Dell, Plaintiff Brothers' employment with Dell ended on September 7, 2005.  (See Brothers Decl. at ¶ 1.)  Plaintiff Brothers filed her consent to join this lawsuit on September 26, 2008.  As admitted in his declaration and as confirmed by Dell, Plaintiff Mendenhall's employment with Dell ended in July 2005.  (Mendenhall Decl. at ¶ 1.)  Plaintiff Mendenhall filed his consent to join this lawsuit on August 5, 2008.

**C.     PLAINTIFFS' COMPENSATION AT DELL**

**Background Information about Plaintiffs' Compensation at Dell**

15.     Non-consumer sales representatives, including Plaintiffs, received a fixed weekly salary each week and were paid overtime at a fluctuating rate for additional time worked beyond forty hours a week.  (Atsumi Decl. at ¶ 3; Hudanick Decl. at ¶ 7.)  For examples of deposition testimony in which Plaintiffs admit that they were paid on a salary basis, see Table 2, infra.

16.     If a sales representative worked any time in a given work week, he or she would receive his or her full, fixed weekly salary.  (Atsumi Decl. at ¶ 3; Hudanick Decl. at ¶ 7.)  No deductions were made from sales representatives' salaries.  (Id.)  This is true even if a sales representative was out of vacation or other  paid time off.  (Id.)  For example:

- Plaintiff Tommy Moore worked 37.5 hours in the workweek ending June 25, 2006.  He used no paid time off hours, but received his entire salary. In the two workweeks ending August 6, 2006, he worked 34 hours and 37 hours respectively.  He used no paid time off benefits in either week, but received his full salary for each week.

- Plaintiff Tracie Webb worked only 33.75 hours in the week ending September 30, 2007, used no paid time off hours, but received her full salary.

- Plaintiff Joshua Clanton worked only 37 hours for the workweek ending December 16, 2007, used no paid time off hours, yet received his full salary.

17.   Plaintiffs were classified as non-exempt from the overtime requirements of the FLSA and paid according to the fluctuating work week method of compensation.  (Atsumi Decl. at ¶¶ 3, 7; Hudanick Decl. at ¶ 7; Pls.' Mot. at Ex. F.)

18.   Under the fluctuating workweek method of compensation, an employer pays its salaried, non-exempt employees a fixed weekly salary as compensation for all hours worked by the employee during the week, in addition to an overtime premium at half the employee's regular rate.  See 29 C.F.R. § 778.114.  "Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement."  Id.; see also Pls.' Mot. at Ex. F.

**Timekeeping at Dell**

19.   Plaintiffs reported their work time at Dell by entering, adjusting, and approving the time that they worked into a commercially available software program from a company called Kronos (hereinafter "Kronos").  (Atsumi Dep. at 86:5-87:7; Barker Dep. at 15:11-19; Brothers Dep. at 19:3-5, 22:1-3; Carson Dep. 27:12-28:3; Dowell Dep. at 28:5-18; Haley Dep. at 33:13-18, 34:5-7; Rickets Dep. at 16:2-18; Schrouf Dep. at 23:2-13; Webb Dep. at 23:10-17.)

20.   Plaintiffs had the responsibility and the ability to record all of their work time in Kronos accurately for pay purposes.  (See Hudanick Decl. at ¶ 9-11; Gandhi Dep. at Ex. 2.)

21.    Plaintiffs also had the ability to modify their reported work time after a pay period closed in Kronos via a WOW request.  (<u>See</u> Atsumi Dep. at 100:23-101:6; Atsumi Decl. at ¶ 9.)

**<u>Plaintiffs' Training at Dell</u>**

22.    Dell employees received training and information about how they were to be compensated.  (Atsumi Decl. at ¶ 4.)

23.    Prior to accepting a job with Dell, non-consumer sales representatives, including Plaintiffs, were interviewed, received an offer packet, and attended an offer session where they were told that their position was classified as "salaried non-exempt" and that their weekly salary was intended to compensate them for all hours worked with overtime paid at a half-time rate. (Atsumi Decl. at ¶ 5; <u>see also</u> Pls.' Mot. at Ex. I.)

24.    The training materials attached to the Declaration of Amy Atsumi (including the training materials attached as Exhibit F to Plaintiffs' Factual Appendix) are representative of training materials that would have been presented to non-consumer sales representatives. (Atsumi Decl. at ¶ 6 & Attach. 1-3.)  These materials demonstrate that sales representatives received detailed information regarding how they were paid and how to enter their worked time into Kronos accurately.

25.    Plaintiffs received training presentations and materials explaining that they were paid on a salaried basis.  For example, Exhibit F to Plaintiffs' Motion is a set of Dell PowerPoint® training slides that explain the salaried non-exempt pay structure.  The first line of the first page states: ***"Weekly salary (paid bi-weekly) <u>paid regardless of number of hours</u> <u>worked</u>."*** (<u>See</u> Atsumi Decl. at ¶ 6 & Attach. 1.) (emphasis added).  Each of the next two pages states: "Pay=$450 (receive salary regardless of # of hours worked)."  (<u>Id.</u>)

26.     Plaintiffs received other training materials that made clear that they received a bi-weekly base salary.  (See Gandhi Dep., Ex. 1 at 2; Atsumi Decl. at ¶ 6 & Attach. 1, 3.)

27.     Plaintiffs received training on the use of Kronos.  (See Atsumi Decl. at ¶¶ 4, 6.)

28.     Training materials provided to Dell employees explained the importance of Kronos, including the fact that employees were "responsible for filling out timesheets in Kronos every week" and that they would not receive a paycheck if they did not report their hours.  (See Gandhi Dep. at Ex. 2.)

29.     Dell employees also received training presentations and materials explaining how to enter worked time into Kronos.  (Atsumi Decl. at ¶ 6, Attach. 2; Gandhi Dep. at Ex. 2.)

30.     Plaintiffs' training included instructions on how to ensure that Kronos accurately reflected their time if they worked through a lunch period.  As Ms. Atsumi testified in her deposition, Dell "make[s] it very clear to all sales representatives in the business sales division that it's their responsibility to ensure that their KRONOS entries are accurate, which means if they worked through their lunch period or a portion of their lunch period, it's their responsibility to punch in and out accordingly or to reflect that in their KRONOS records so that they can be compensated for that portion worked."  (Atsumi Dep. at 98:21-99:4.)

31.     Kronos would automatically deduct one hour for a lunch period unless the employee canceled the deduction by entering the cancel deduction code (represented as "CD" on Kronos records) or by simply reporting a different lunch period by clocking out and clocking in. (Hudanick Decl. at ¶ 11; Atsumi Dep. at 99:15-23.)

32.     Training materials provided to Plaintiffs, like those in Attachment 2 to the Declaration of Amy Atsumi, carefully explained that Kronos would automatically deduct an hour

for lunch after the sixth worked hour and how employees could cancel the automatic lunch deduction if they worked through lunch.  (Atsumi Decl. at ¶ 6, Attach. 2 at DELL 575-78.)

**Pre-Shift and Post-Shift Activities**

33.     Plaintiffs' own deposition testimony shows that they knew how to enter their worked time accurately into Kronos and that they knew they were responsible for entering their worked time accurately into Kronos.  Several Plaintiffs also admitted that they diligently entered all their worked time into Kronos accurately.  The following table includes examples of excerpts from Plaintiffs' deposition testimony showing their familiarity with Kronos and with the requirement that they enter their time accurately.

**Table 1 – Plaintiffs' Deposition Testimony Regarding Entering Time Accurately into Kronos**

| Plaintiff | Deposition Testimony |
|---|---|
| Barker | Q.      Now, how did you keep your time when you worked at Dell?<br>A.      Through a program called Kronos.<br>Q.      And did you enter your own time or was it entered automatically?<br>A.      I entered my own.<br>Q.      And did that stay the case the whole time you worked at Dell?<br>A.      Yes, sir.<br>**Barker Dep. at 15:11-19.** |
| Brothers | Q.      So as far as you know, all of the time that went into Kronos, that you checked, was accurate?<br>A.      I don't remember, but...<br>Q.      The only one you remember is the one time, and that one got fixed?<br>A.      Yes.<br>Q.      And you would enter the time into Kronos just like you wrote it down on your sheet of paper?<br>A.      Yes.<br>**Brothers Dep. at 65:4-65:14.** |
| Carson | Q.      In terms of putting the time down, did you put down all the time that you worked?<br>A.      Yes.<br>Q.      Anyone ever tell you "Don't put down this time" or anything like that?<br>A.      No.<br>Q.      So you would put down from when you started working till you finished working?<br>A.      Correct.<br>**Carson Dep. at 27:20-28:3.** |
| Dowell | Q.      And what did Jan -- what was your understanding of what you were supposed to do on inputting time?<br>A.      That we were supposed -- when you come in the morning, you put in the time that you come in. When you go to lunch, you put in the time you went to lunch. When you come back, you put in that time. And then when you go home, you put in that time. You weren't supposed to wait until like the next day to input the day before. |

|  | Q. | Did you try to do that on a regular basis? |
|--|----|--------------------------------------------|
|  | A. | Yes. |
|  | **Dowell Dep. at 28:5-18.** | |
| Haley | Q. | When you worked -- first started working, how did you keep records of your time? |
|  | A. | Through Kronos. |
|  | Q. | And would you go in and enter it into Kronos? |
|  | A. | I would. |
|  | ... | |
|  | Q. | So you had control over what time you entered into Kronos? |
|  | A. | Yes. |
|  | **Haley Dep. at 33:13-18, 34:5-7.** | |
| Ricketts | Q. | Then if you worked -- came in early or left late, you would go in and make an adjustment? |
|  | A. | Correct. |
|  | Q. | You were the one who was totally responsible for doing that? |
|  | A. | Correct. |
|  | **Ricketts Dep. at 16:2-18.** | |
| Schrouf | Q. | So you don't remember whether you filled it in or somebody else did? |
|  | A. | Well, I kept track of my own time. |
|  | Q. | Oh, okay. And as far as you know, was the time that you kept track of accurate? |
|  | A. | As far as I know. |
|  | **Schrouf Dep. at 23:8-13.** | |

34.     An analysis of Plaintiffs' Kronos records shows that Plaintiffs routinely entered the precise times when they began and finished work.  For example:

- Plaintiff Romriell was scheduled to work from 8:00 am to 5:00 pm in June, July and August of 2006.  He routinely reported hours as early as 7:15 am.  During those three months, there were only three days in which he clocked in at 8:00 am or later.  Although his shift was scheduled to end at 5:00 pm, he routinely clocked out much later, sometimes as late as 9:00 pm.  Mr. Romriell clocked out at exactly 5:00 pm only 12 times and clocked out later 33 times during those months.

- From May to July 2006, Plaintiff Haley was scheduled to work starting at 8:00 am.  He routinely clocked in at 7:30 am.

- Plaintiff Davis was employed by Dell from July 2005 until October of 2005.  She clocked in at times ranging from as early as 7:00 am to as late as 10:45 am and clocked out as late as 10:50 pm.  She clocked out at exactly 5:00 pm only on four occasions, three of which were in the first week of her employment.

(Hudanick Decl. at ¶ 9.)

35.     Plaintiffs have dissimilar allegations regarding preliminary activities that they allegedly had to perform before each shift.  Only *six* of the Plaintiffs' declarations allege that they performed any pre-shift or post-shift activities without pay, including "booting up their

computers," "logging on to Dell's computer network," or "opening required computer programs"
before each shift.  (See Pls.' Mot. at ¶ 21.)  Plaintiff Carson, on the other hand, testified that her
time spent on these activities was minimal:

> Q.    How long did it take you to boot up your computer when you were at Dell?
> A.    I'd say maybe about two minutes, three minutes.
> Q.    Then you'd be up and running every day?
> A.    Yes.

(Carson Dep. at 17:20-25.)

36.    Plaintiff Dowell testified that sales representatives normally left their computers
turned on at the end of each shift and therefore did not have to boot up their computers the next
morning:

> Q.    When you went to turn on your computer, how long did that normally take to get
>       up and running?
> A.    Normally our computers would already be on. All you'd have to do would be to
>       log into them. And since we didn't share computers, there wasn't really any reason
>       for us to log off unless IT sent us an e-mail that said we're doing updates tonight,
>       then you would log off your computer.
> Q.    So the standard operating procedure was just leave your computer running when
>       you left at night?
> A.    Yes.
> Q.    So theoretically once you got there and sat down you were ready to go?
> A.    Yes.

(Dowell Dep. at 58:22-59:13.)

**<u>Lunch Periods</u>**

37.    Plaintiffs' time records show that Plaintiffs accurately recorded instances where
they worked during all or part of their one hour lunch break.  (Hudanick Decl. at ¶ 11.)  For
example:

- During the three years prior to his joining the litigation, Plaintiff Schrouf
  worked 242 days for Dell.  Of those 242 days, he reported a lunch period
  and did not have a lunch hour deduction on 239 days.  The only days he
  did not report a different lunch period were June 1, 2006 and November
  16-17, 2006 (his last two days of work).

- Plaintiff Wojciechowski worked 41 days for Dell in the three years prior to joining this suit. Of those days, he did not have a single day on which the default one-hour deduction was applied. Instead, he clocked out and back in for his meal breaks.

- Of the approximately 435 work days at Dell in the three years before Plaintiff Nicholas Stewart joined the lawsuit, Mr. Stewart had the automatic one-hour deduction on only 23 days. He used the "CD" code to cancel the lunch deduction almost 400 times during that same period.

- Other Plaintiffs also routinely used either the clock-out/clock-in or "CD" code method to cancel the default deduction when they worked during a lunch period, including Plaintiffs Gandhi, Barker, Haley, Pate, Romriell, Snead, and Webb.

(Id.)

D.  **DIFFERENCES BETWEEN "BUSINESS SALES REPRESENTATIVES" AND *CONSUMER SALES REPRESENTATIVES***

38.     The SMB Unit is one of four business units at Dell in which sales representatives may work: Large Enterprise, SMB, Public, and Consumer. Plaintiffs have asked the Court to take note of the United States District Court of Oregon's decision to conditionally certify a FLSA collective action involving a class of Dell "consumer sales representatives," a different kind of call center employee, in Norman, et al. v. Dell Inc., et al., No. 07-6028, 2008 WL 2899722 (D. Or. July 10, 2008). Norman involved employees in the Consumer Sales Unit, whereas this case involves employees in the SMB Unit. In addition to having different management, different HR support groups, and different training support groups (many of which would differ from business unit to business unit), representatives in the business groups would differ from representatives in the Consumer Sales group in other significant ways:

- Although both consumer and non-consumer sales representatives time is recorded in Kronos, there are significant differences. Non-consumer sales representatives at all times were responsible for manually entering their time and were able to correct any inaccurate time entry. By contrast, after November 1, 2005 consumer sales representatives, were unable to manually enter their time, instead it was automatically entered for them. If a time entry needed to be corrected, consumer representatives did not have the ability to do so, but had to go through their managers or payroll.

- No or extremely limited use of pre-shift huddles
- Non-consumer sales are less seasonal in nature
- Not all non-consumer sales representatives are controlled by Call Center Operations
- Sales mix ratios (base to quota compensation ratio)
- Different performance metrics
- Type of products sold and required product knowledge, experience and training
- Account management processes and customer engagement procedures
- Non-consumer sales representatives have always been paid as salaried non-exempt and paid on the basis of a fluctuating workweek.  Consumer sales representatives were converted to hourly between May 14 and October 29, 2007.
- All consumer sales representatives are transactional. A substantial number of non-consumer sales representatives are relational.

(Atsumi Decl. at ¶ 8.)

### DISCREPANCIES BETWEEN PLAINTIFFS' DECLARATIONS AND DEPOSITION TESTIMONY

39.     Plaintiffs attached fourteen nearly identical declarations to their Motion.  These declarations make the same substantive assertions, with occasional minor variations in wording.

40.     Of the fourteen Plaintiffs who filed declarations, all Plaintiffs except Jamey Mendenhall have been deposed.

41.     The following two tables compare portions of Plaintiffs' declarations to directly contradictory excerpts from Plaintiffs' deposition testimony.   The first table addresses contradictions in Plaintiffs' allegations about their salaries.   The second table addresses contradictions in Plaintiffs' allegations about lunch periods at Dell.

### Table 2 – Contradictions Between Plaintiffs' Declarations and Deposition Testimony Regarding Their Salaries

| Plaintiff | Declaration | Deposition Testimony |
|---|---|---|
| Barker | • Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then* | "Q. Okay. And it talks about a base pay, incentive pay mix of 80/20 or the slide next talks about 60/40. Were those terms that you were familiar with? |

| | | |
|---|---|---|
| | *Dell would deduct from my purported base salary.*"<br><br>• Decl. at ¶ 6: "*It was my understanding that I had to work at least forty (40) hours per week to be eligible to receive my purported base salary*" | A. Yes.<br>Q. And what does that mean?<br>A. 80/20 refers to your -- your guaranteed versus your at-risk.<br>Q. And the base is guaranteed and the commission is at-risk?<br>A. Correct."<br>**Barker Dep. at 25:21-26:6.** |
| Brothers | • Decl. at ¶ 1: "*I was a full-time <u>hourly</u> employee . . .*"<br>• Decl. at ¶ 5: "*It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary.*"<br>• Decl. at ¶ 6: "*Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week.*" | Q  It says, on the weekly salary:  "Paid biweekly, paid regardless of number of hours worked."<br>      Is that the way you understood your compensation to be?  That you got a fixed  salary, regardless of the number of hours that you worked?<br>A  Yes.<br>**Brothers Dep. at 56:7-14.** |
| Carson | • Decl. at ¶ 1: "*I was a full-time <u>hourly</u> employee . . .*"<br>• Decl. at ¶ 5: "*It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary.*"<br>• Decl. at ¶ 6: "*Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week.*" | Q When you came to work at Dell, how were you paid?<br>A Salary.<br>Q And was part of that salary guaranteed?  I mean, was there a guaranteed base that you would receive?<br>A Yes.<br>**Carson Dep. at 15:9-15.** |
| Davis | • Decl. at ¶ 1: "*I was a full-time <u>hourly</u> employee . . .*"<br>• Decl. at ¶ 5: "*It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary.*"<br>• Decl. at ¶ 6: "*Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week.*" | Q  How were you paid?  On what basis were you paid?<br>A  I had an offering letter.<br>Q  Was it hourly, salary?<br>A  Salary, nonexempt.<br>**Davis Dep. at 24:3-7.**<br><br>Q  Do you remember whether or not you were always paid your base salary, regardless of the number of hours that you worked?  I mean, there wasn't a time where your pay got docked or anything like that?<br>A  I don't believe it was docked, no, sir.<br>**Davis Dep. at 66:8-13.** |
| Haley | • Decl. at ¶ 1: "*I was a full-time <u>hourly</u> employee . . .*"<br>• Decl. at ¶ 5: "*It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary.*"<br>• Decl. at ¶ 6: "*Dell did not explain to* | Q. Now, you indicated that as a Spherion employee, it was -- you were an hourly employee, paid on an hourly basis?<br>A. Yes.<br>Q. And that changed when you became a Dell employee?<br>A. It's my understanding that that changed.<br>**Haley Dep. at 32:10-17.** |

| | | |
|---|---|---|
| | *me that I would receive my purported base salary no matter how many hours I worked in a week."* | |
| Moore | • Decl. at ¶ 1: *"I was a full-time <u>hourly</u> employee . . ."*<br>• Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary."*<br>• Decl. at ¶ 6: *"Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week."* | Q   So was it your understanding that you've always received the same base pay each week?<br>A   Yes.<br>Q   Regardless of the number of hours that you've worked?<br>A   Yes.<br>**Moore Dep. at 66:21-67:2.**<br><br>Q   The first page says:  "Weekly salary paid biweekly."<br>    You understood that was how you were paid?<br>A   Yes.<br>Q   And you knew you were paid that weekly salary, regardless of number of hours worked?<br>A   Yes.<br>**Moore Dep. at 75:14-21.**<br><br>Q   Okay.  You had an understanding that your weekly salary stayed the same regardless of the number of hours that you worked?<br>A   Yes.<br>**Moore Dep. at 77:7-10.** |
| Ricketts | • Decl. at ¶ 1: *"I was a full-time <u>hourly</u> employee . . ."*<br>• Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary."*<br>• Decl. at ¶ 6: *"Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week."* | Q ... And the base pay was a hourly rate or a salary -- and you were paid salary?<br>A   Salary, nonexempt.<br>Q   Right.<br>    And paid for job performed, paid every two weeks.<br>    And that was guaranteed or fixed; correct?<br>A   Correct.<br>**Ricketts Dep. at 46:3-11.** |
| Schrouf | • Decl. at ¶ 1: *"I was a full-time <u>hourly</u> employee . . ."*<br>• Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary."*<br>• Decl. at ¶ 6: *"Dell did not explain to me that I would receive my purported base salary no matter how many hours I worked in a week."* | Q And one of the differences between an SR1B and an SR1, at least on this, is a difference in the mix.  As an SR1B, it's an 80/20 mix and as an SR1, 60/40.<br>Do you recall, was that your mix between commission and base when you were there?<br>A I believe that's correct.<br>Q That you started off with 80 percent base pay guaranteed and 20 percent commission?<br>A Yeah.<br>**Schrouf Dep. at 37:7-16.**<br><br>Q And so in each bi-weekly paycheck, you would get base pay, and then if you had worked more than 40 hours in any week, you would get some amount of overtime pay; is that correct?<br>A I believe that's right.<br>**Schrouf Dep. at 40:24-41:3.** |

18

| Stewart | • Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary."*<br>• Decl. at ¶ 6: *"It was my understanding that I had to work at least forty (40) hours per week to be eligible to receive my purported base salary"* | Q. And how were you compensated?<br>A. Just like anyone else on the floor. We had base salary as well as a commission and then bonuses on top of that.<br>**Stewart Dep. at 19:15-18.**<br><br>Q. In terms of compensation, how was it paid? Was it on a -- it was a base and a salary -- I mean a commission?<br>A. That's correct. Just like any other sales role within the business department.<br>**Stewart Dep. at 30:9-13.**<br><br>Q. Was there ever a time where you got paid less than 40?<br>A. No. I have always worked 40 hours or more.<br>**Stewart Dep. at 47:9-12.**<br><br>There had always been an overtime payment, which actually surprised me, since we were classified as salary.<br>**Stewart Dep. at 59:9-11.** |
| Wojciechowski | • Decl. at ¶ 5: *"It was my understanding that if I missed work and did not have any paid leave time available, or if I worked fewer than forty (40) hours per week, then Dell would deduct from my purported base salary."*<br>• Decl. at ¶ 6: *"It was my understanding that I had to work at least forty (40) hours per week to be eligible to receive my purported base salary"* | Q And as I understand your compensation package, it consisted of a base salary and a commission piece; is that right?<br>A That's correct.<br>**Wojciechowski Dep. at 18:24-19:2.** |

**<u>Table 3 – Contradictions Between Plaintiffs' Declarations and Deposition Testimony Regarding Lunch Periods</u>**

| Plaintiff | Declaration | Deposition Testimony |
|---|---|---|
| Barker | • Decl. at ¶ 7: *"Dell automatically deducted one hour of pay for my lunch break."*<br>• Decl. at ¶ 8: *"The work I performed for Dell during my lunch break was sometimes unpaid."* | "Q. Okay. And even though it was prededucted, did you have the ability to alter that?<br>A. You could. You could go in and do -- it was -- it was hard to do it, but you could.<br>Q. How did you -- how would you do it?<br>A. You would go in and you would do like no lunch deduct. You would -- there would – if you look on Page 00291, I believe it was under Transfer, but there was a drop-down and you could do like a lunch deduct on it, like if you did not take a lunch. However, again, most of the time I would just leave it, unless I could for sure say that I only took a 30-minute lunch that particular time, because, again, there was very little logging in and out of the actual time."<br>**Barker Dep. at 61:5-20.** |
| Brothers | • Decl. at ¶ 8: *"The work I performed for Dell during my lunch break was sometimes* | Q  And if you ate through lunch, were you supposed to count that as time worked? |

19

| | | |
|---|---|---|
| | *unpaid."* | A  I counted it as time worked.<br>Q  And as I understand it, you would either enter the time in Kronos or at least go in and check to see if it was accurate?<br>A  I believe so.<br>Q  Did you ever -- was there ever – and if you entered it, I assume you would enter it accurately; correct?<br>A  Yes.<br>**Brothers Dep. at 63:12-22.** |
| Carson | • Decl. at ¶ 8: *"The work I performed for Dell during my lunch break was <u>routinely unpaid</u>."* (emphasis added). | Q In terms of putting the time down, did you put down all the time that you worked?<br>A Yes.<br>Q Anyone ever tell you "Don't put down this time" or anything like that?<br>A No.<br>Q So you would put down from when you started working till you finished working?<br>A. Correct.<br>. . .<br>Q You don't know? Did you ever make any adjustments for lunch?<br>A Yes. Sometimes I could skip lunch or come back early or --<br>Q And did you put that time in properly as well?<br>A Yes.<br>Q So if you, like, went to lunch at 1:30, started at 8:00, went at 1:30 and came back at 2:00, you'd put in 8:00 to 1:30 and 2:00 to whenever you left?<br>A Yes.<br>**Carson Dep. at 27:20-28:20.** |
| Davis | • Decl. at ¶ 7: *"Dell automatically deducted one hour of pay for my lunch break."* | Q  Do you remember how lunch was accounted for?  Was it something you had to do or --<br>A  I --<br>Q  Don't remember?<br>A  Huh-uh.  No, sir.<br>Q  Do you remember if -- ever hear any mention that Kronos automatically deducted an hour?<br>A  No, I don't.<br>**Davis Dep. at 47:4-12.**<br><br>Q  Did you ever take lunches?<br>A  Once in a blue moon, we would go down to the cafeteria.  But we would clock out.<br>**Davis Dep. at 77:18-20.** |
| Haley | • Decl. at ¶ 8: *"Dell automatically deducted one hour of pay for my lunch break."*<br>• Decl. at ¶ 9: *"The work I performed for Dell before my scheduled shift, during my lunch break, and after my scheduled shift ended was <u>routinely unpaid</u>."* (emphasis added). | Q.  So you had control over what time you entered into Kronos?<br>A.  Yes.<br>**Haley Dep. at 34:5-7.**<br><br>Q. And if you worked 15 minutes of your lunch, did you have the ability to go in and change that if you wanted?<br>A. I think so, yes.<br>Q. And did you ever do that?<br>A. Not over 15 minutes. I'm sure of that. But I think |

| | | |
|---|---|---|
| | | I did. You mean counteract the automatic deduction?<br>Q. Yes, sir.<br>A. Yes.<br>Q. You had the ability to do that?<br>A. I did.<br>Q. And did so on some occasions?<br>A. I did, I think.<br>**Haley Dep. at 132:5-19.** |
| Moore | • Decl. at ¶ 7: *"Dell automatically deducted one hour of pay for my lunch break."* | Q   Did you know anything about the way Kronos handled time for lunch?<br>A   No.<br>Q   You don't know whether it deducted an hour from your schedule or not?<br>A   No.<br>**Moore Dep. at 20:16-21.** |
| Ricketts | • Decl. at ¶ 8: *"The work I performed for Dell before my scheduled shift, during my lunch break, and after my scheduled shift ended was **<u>routinely unpaid</u>**."* (emphasis added). | Q   Then if you worked -- came in early or left late, you would go in and make an adjustment?<br>A   Correct.<br>Q   You were the one who was totally responsible for doing that?<br>A   Correct.<br>**Ricketts Dep. at 16:2-18.**<br><br>A   No.  I just told my manager, "Hey, I didn't take a lunch."  Or my manager knew I didn't take a lunch.  He would go get us lunch, bring it to us.  He knew we weren't taking a lunch.<br>Q   So he would then fix it?<br>A   Assuming he did, yeah.<br>. . .<br>Q   As far as you know, he was taking care of it?<br>A   Correct.<br>**Ricketts Dep. at 32:11-33:4.** |
| Wojciechowski | • Decl. at ¶ 8: *"Dell automatically deducted one hour of pay for my lunch break."*<br>• Decl. at ¶ 9: *"The work I performed for Dell before my scheduled shift, during my lunch break, and after my scheduled shift ended was **<u>often</u>** unpaid."* (emphasis added). | A   Occasionally -- it seemed like I remember when we realized that, after the first paycheck or two, that they were taking – they were hitting you for an hour lunch whether you took that hour lunch or not. I may have gone in and adjusted and put "no lunch" in there.<br>Q   So you had the ability to do that?<br>A   You could do that. Yes, you could do that.<br>Q   And I assume you did -- those days where you worked through lunch, you would go in and make that adjustment?<br>A   Once I realized, yes, that -- that it was possible and they were doing that, they were taking that hour whether you took it or not, you know. So I had to go in and make that adjustment manually.<br>**Wojciechowski Dep. at 35:3-19.** |

Respectfully submitted,

/s/    Jeffrey C. Londa
Jeffrey C. Londa, TX #12512400
OGLETREE, DEAKINS, NASH, SMOAK
   & STEWART, P.C.
jeffrey.londa@ogletreedeakins.com
500 Dallas Street, Suite 3000
Houston, Texas 77002-4709
(713) 655-5750
(713) 655-0020 (Fax)

Michael W. Fox, TX #07335500
Ogletree, Deakins, Nash, Smoak
   & STEWART, P.C.
michael.fox@ogletreedeakins.com
301 Congress Avenue, Suite 1250
Austin, Texas 78701
(512) 344-4700
(512) 344-4701 (Fax)

Brittan L. Buchanan, TX #03285680
Van Osselaer & Buchanan LLP
9600 Great Hills Trail, Suite 300 West
Austin, Texas 78759
512.225.2822 (direct)
512.225.2801 (fax)

**ATTORNEYS FOR DEFENDANTS
DELL INC.,  DELL USA L.P., AND DELL
MARKETING USA L.P.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of February, 2009, a copy of the foregoing pleading was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system and by regular U.S. mail to all counsel of record.

George A. Hanson
Matthew L. Dameron
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO  64112

Meredith Black-Matthews
J. Derek Braziel
Lee & Braziel, L.L.P.
1801 N. Lamar Street, Suite 324
Dallas, TX  75202

/s/   Jeffrey C. Londa
Jeffrey C. Londa