# EXHIBIT A

Catherine L. Davis, et al. v.                    Michael B. Hudanick
Dell, Inc., et al.                                October 13, 2008

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
   CATHERINE L. DAVIS and        )
 3 TOMMY MOORE, individually     )
   and on behalf of others       )
 4 Similarly situated,           )
          Plaintiffs,            ) CASE NO. 5L07-cv-01401-W
 5                               )
   VS.                           )
 6                               )
   DELL, INC. d/b/a DELL         )
 7 COMPUTER, INC., DELL USA      )
   L.P., AND DELL                ) CLASS ACTION COMPLAINT
 8 MARKETING, L.P.,              )
          Defendants.            ) DEMAND FOR JURY TRIAL
 9

10 *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

11                      ORAL DEPOSITION OF
                        MICHAEL B. HUDANICK
12
                        OCTOBER 13, 2008
13
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
14

15      ORAL DEPOSITION OF MICHAEL B. HUDANICK,

16 produced as a witness at the instance of the

17 PLAINTIFFS, and duly sworn, was taken in the

18 above-styled and numbered cause on the 13TH of

19 OCTOBER, 2008, before Brenda J. Wright, RPR, CSR in

20 and for the State of Texas, reported by machine

21 shorthand, at the Law Offices of Ogletree, Deakins,

22 Nash, Smoak & Stewart, 301 Congress Avenue, Suite

23 1250, Austin, Texas, pursuant to the Federal Rules of

24 Civil Procedure and the provisions stated on the

25 record or attached herein.
```

Catherine L. Davis, et al. v.
Dell, Inc., et al.

Michael B. Hudanick
October 13, 2008

---

50

1 of size of the business.
2    Q.   What is the spending comparison, for
3 purposes of quantifying a business being an SMB as
4 opposed to an account that goes to the corporate
5 account?
6    A.   It -- it's spending.  So I can't give you
7 the -- I don't know the specific dollar breaks, but
8 it's based upon kind of the -- the customer set, as
9 well as the net number of servers that they would
10 have.  So in terms of the -- the equipment, as well as
11 the dollars spent, is what distinguishes SMB from one
12 of the corporate or public groups.
13    Q.   Who makes the decision that something would
14 be a corporate account, as opposed to fitting within
15 one of these other units of the SMB?
16    A.   It's driven by finance and how they segment
17 their -- their accounts.
18    Q.   So the finance group looks at this, and they
19 basically tell you-all, as well as the CCO group and
20 everyone else, that this particular account is going
21 to fall under SMB?
22    A.   Well, they would come up with general
23 guidelines.
24    Q.   Okay.
25    A.   And then as they -- if a new customer calls

---

51

1 in, the sales maker would inquire and, you know, match
2 it against the guidelines and determine whether it's
3 something that they would handle or need to route to
4 another part of the company.
5    Q.   Okay.  So the finance group would
6 essentially make this determination.  They would come
7 up with the guidelines, and then they would
8 communicate those down to the sales people?
9    A.   Correct.
10    Q.   Okay.  Are each of the employees within each
11 of these various units all considered ISRs?
12    A.   In those units, correct.  There are -- there
13 are some additional units.
14    Q.   And they're, again, all considered salaried
15 nonexempt at this point?
16    A.   That's correct.  All sales makers, with the
17 exception of consumer, are salaried nonexempt.
18    Q.   And training for those folks would follow
19 the same guidelines as, for example, what we're
20 looking at here?
21    A.   Generally, our formal training occurs for
22 the new hires.  And as they progress through the
23 ranks, it's more on-the-job training versus a
24 formalized training.  There is some specialized
25 training, based on the nature of the job, but the

---

52

1 formal compensation training only occurs during new
2 hire.
3    Q.   Okay.  All right.  All right.  If you look
4 at total target compensation, it says, the expected
5 pay for a position, including both base pay and
6 incentive pay, the variable portion of target
7 compensation is based on what the employee will earn
8 at 100 percent attainment.  So that's if -- if they
9 hit their goal at 100 percent, they would reach the
10 total target comp?
11    A.   If they hit a hundred percent attainment as
12 well as target in stacks, so a hundred percent in
13 stacks would be TTC.
14    Q.   You have to be a 100 percent on commission
15 and stacks to reach TTC?
16    A.   Correct.
17    Q.   All right.  You said you didn't particularly
18 have any input in five here, but this is talking about
19 weighting.  And you've mentioned weighting a little
20 bit earlier.  Can you tell me generally what the
21 component weighting is referring to as it relates to
22 compensation for the ISRs?
23    A.   It would be the -- the weight of the -- you
24 know, the -- the -- the metrics of -- for example, in
25 the SMB business, the two metrics within their plan

---

53

1 are revenue and margin.  So it's the weight assigned
2 to revenue and the weight assigned to margin within
3 their plan.
4    Q.   All right.  And there is a reference down
5 there to SRIBs.  What is an SRIB?
6    A.   It's a sales rep IB.  That's our entry level
7 sales rep position within SMB.
8    Q.   Okay.  And those two notes are really just
9 effectively saying the SR -- is that SRI?
10    A.   SR IB and SRI.
11    Q.   Okay.  SRI through SR IV have the
12 opportunity to make a greater variable component of
13 their salary?
14    A.   What this -- so are you talking to the
15 accelerator language --
16    Q.   Yes.
17    A.   -- on slide five?
18    Q.   Yeah.
19    A.   So that's the -- for exceeding a
20 hundred percent, the amount of acceleration applied.
21 So for an SR IB, for example, if they're at 110, they
22 get two X applied to the 10 percent over 100.
23    Q.   Uh-huh.
24    A.   The other sales makers would get four X
25 applied.  So, you know, to use that same example, 110,

---

Catherine L. Davis, et al. v.
Dell, Inc., et al.

Michael B. Hudanick
October 13, 2008

---

146

1   A.  The one difference -- or at least the one
2 column on page two, it does -- the note indicates that
3 incentive overtime premium is calculated at -- at the
4 completion of a fiscal quarter.  It is based on total
5 hours worked and incentive pay earned during that
6 quarter.  I'm not sure if Exhibit 9 had that note in
7 it or not.
8   Q.  (BY MS. WATERS)  Okay.  And is this --
9 again, we don't know if this is a training slide or if
10 this was used in any manner for purposes of training,
11 do we?
12   A.  I'm not sure how it was used.  I just recall
13 seeing this version.  When I had a question on one
14 calculation, I remember having this sent to me.
15   Q.  Okay.  And the second page, the note there,
16 is that an -- a reference to true-up, even though the
17 words true-up are not referenced?
18   A.  My understanding is that is -- that is
19 correct because it -- it talks about that it's
20 calculated at the completion of the quarter, based on
21 total hours and incentive pay earned.
22   Q.  But it doesn't say anything about it being
23 bumped up to meet minimum standard wage requirements,
24 does it?
25   A.  It just says it's paid after commissions

---

147

1 have been paid for the last month.  So it indicates
2 it's a -- a secondary incentive payment.
3   Q.  Okay.  And there may be various other
4 iterations of the policies and compensation and
5 administration documents, other than what we've looked
6 at today.  Is that true?
7   A.  That's correct.
8   Q.  On average, how many times a year does Dell
9 go back and issue new compensation policies and
10 administration guidelines?
11   A.  It varies by segment.  Some segments, it may
12 not be updated at all.  Other segments may be a minor
13 modification, where it's just a word change.  I
14 couldn't hazard what an average is.  It could go from
15 zero to five or six.
16   Q.  Okay.
17   A.  But it's -- it's very business specific.
18      MS. WATERS:  Pass the witness.
19      MR. FOX:  We'll reserve our questions
20 until the time of trial.
21
22
23
24
25

---

148

1       CHANGES AND SIGNATURE
2 Page/Line    Correction    Reason for Correction
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24       I, MICHAEL B. HUDANICK, have read the
25 foregoing deposition and hereby affix my signature

---

149

1 that same is true and correct, except as noted above.
2
3
4      _____
5      MICHAEL B. HUDANICK
6
7
8 THE STATE OF _____ )
9 COUNTY OF _____ )
10
11      Before me, _____, on
12 this day personally appeared MICHAEL B. HUDANICK,
13 known to me to be the person whose name is subscribed
14 to the foregoing instrument and acknowledged to me
15 that they executed the same for the purposes and
16 consideration therein expressed.
17      Given under my hand and seal of office
18 this _____ day of _____,
19 _____.
20
21      _____
22      NOTARY PUBLIC IN AND FOR
23      THE STATE OF _____
24
25 JOB NO. 081013BJW

---

**Wright Watson & Associates**
**512-474-4363**

Catherine L. Davis, et al. v.
Dell, Inc., et al.

Michael B. Hudanick
October 13, 2008

---

150

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF OKLAHOMA
2
   CATHERINE L. DAVIS and    )
3 TOMMY MOORE, individually  )
   and on behalf of others   )
4 Similarly situated,        )
         Plaintiffs,         ) CASE NO. 5L07-cv-01401-W
5                            )
   VS.                       )
6                            )
   DELL, INC. d/b/a DELL     )
7 COMPUTER, INC., DELL USA   )
   L.P., AND DELL            ) CLASS ACTION COMPLAINT
8 MARKETING, L.P.,           )
         Defendants.         ) DEMAND FOR JURY TRIAL
9
   * * * * * * * * * * * * * * * * * *
10       REPORTER'S CERTIFICATION
         ORAL DEPOSITION OF
11       MICHAEL B. HUDANICK
         OCTOBER 13, 2008
12 * * * * * * * * * * * * * * * * * *
13      I, BRENDA J. WRIGHT, Certified Shorthand
14 Reporter in and for the State of Texas, hereby certify
15 to the following:
16      That the witness, MICHAEL B. HUDANICK, was duly
17 sworn by the officer and that the transcript of the
18 oral deposition is a true record of the testimony
19 given by the witness;
20      That the deposition transcript was submitted on
21 OCTOBER 30, 2008 to the witness for examination,
22 signature and return to MS. ALLISON B. WATERS;
23      That $_____ is the deposition
24 officer's charges for preparing the original
25 deposition transcript and any copies of exhibits,

---

151

1 charged to PLAINTIFFS;
2      That pursuant to information given to the
3 deposition officer at the time said testimony as
4 taken, the following includes all parties of record:
5 For the Plaintiffs:
         Ms. Allison B. Waters
6      FEDERMAN & SHERWOOD
         10205 N. Pennsylvania Avenue
7      Oklahoma City, Oklahoma  73120
         (405) 235-1560
8 For the Defendants:
         Mr. Michael W. Fox
9      OGLETREE, DEAKINS, NASH, SMOAK &
            STEWART
10       301 Congress Avenue
         Suite 1250
11       Austin, Texas  78701
         (512) 344-4700
12
13      I further certify that I am neither counsel
14 for, related to, nor employed by any of the parties or
15 attorneys in the action in which this proceeding was
16 taken, and further that I am not financially or
17 otherwise interested in the outcome of the action.
18      Certified to by me this 29TH day of OCTOBER,
19 2008.
20
21      _____
         BRENDA J. WRIGHT, Texas CSR No. 1780
22       Expiration Date:  12-31-08
         WRIGHT WATSON & ASSOCIATES
23       Firm Registration No. 225
         Expiration Date:  12-31-09
24       1801 N. Lamar Boulevard, Mezzanine
         Austin, Texas  78701
25       (512) 474-4363    JOB NO. 081013BJW

---

**Wright Watson & Associates**
**512-474-4363**

da064d6e-972b-450a-b4cb-59eb2c2e501f